INTERNATIONAL UNION OF OPERATING ENGINEERS,
LOCAL NO. 564 ET AL V. R. *G.* COX, DOING
BUSINESS AS VELASCO LAUNDRY & CLEANERS.

No. A-1878. Decided March 23, 1949.
Rehearing overruled May 11, 1949.
(219 S. W., 2d Series, 787.)

*Mullinax, Wells & Ball* and *L. N. D. Wells, Jr.,* all of Dallas, and *Robert M. Lyles,* of Angleton, for petitioners.

*Irving G. Mulitz* and *Frank F. Spata,* of Houston, for respondent.

MR. JUSTICE FOLLEY delivered the opinion of the Court.

This suit was filed by respondent, R. G. Cox, doing business as Velasco Laundry & Cleaners, against the petitioners, International Union of Operating Engineers, Local No. 564, and George Williams, Manager of the Union, Priscilla M. McCafferty, Ethel Sifford, Anna May Williams, Lucille Duggar and Nannie Mae Day, striking and discharged employees of the laundry. The suit was for the purpose of enjoining petitioners from picketing the laundry and for damages. After trial before the court without a jury, judgment was rendered permanently enjoining petitioners "from picketing or causing to be picketed the premises and business establishment of plaintiff, R. G. Cox, known as Velasco Laundry & Cleaners, and from congregating

or assembling in the vicinity thereof", and for damages in the sum of $500.00, jointly and severally, against petitioners. That judgment was affirmed by the Court of Civil Appeals. 212 S. W. (2d) 1000.

■ There were no findings of fact or conclusions of law made by the trial court. We must therefore consider the facts in the light most favorable to support the judgment. We observe that rule in the statement of the facts which follow.

The Velasco Laundry & Cleaners is one of several laundries in southern Texas owned by respondent, R. G. Cox. At the time of this controversy it had about forty employees. Cox lives in Houston where his main office is located, but he makes fairly frequent visits to Velasco and other towns where his laundries are situated. The laundry at Velasco is managed by Barton Brown, who hires and discharges employees, keeps the books, and generally supervises the operation of the laundry. The wage scale for various positions in the laundry is set by Cox, but Brown has limited authority to change the wages of employees. Wages ranged from thirty or thirty-five cents per hour for new employees, to sixty or sixty-five cents per hour for experienced help. Brown prepares the payrolls and sends them to Cox who issues checks from the Houston office. Brown makes frequent reports to Cox by telephone or letter concerning the operation of the laundry. The laundry supplies linens to the Dow Chemical Company Hospital and does laundry work for numerous business establishments in and near Velasco.

In June, 1947, some of the employees of the laundry who were dissatisfied with their wages and working conditions sought the assistance of Local No. 564. That Union represents employees at the Dow Chemical Plant in Velasco. On the night of June 16, nine or more employees of the laundry attended a meeting of the Local Union at Velasco. At that meeting most of them registered complaints as to their working conditions and signed cards authorizing the Union to act in their behalf for the purpose of collective bargaining. The next day six of these employees were discharged by the laundry manager. Brown admitted that their names had been furnished him by another employee who attended the Union meeting, but denied that he discharged them for union activities. However, he assigned no other reason for their discharge. He rehired two of these employees at the insistence of the Union. The others were never rehired. It was stipulated, however, that from that date until August 19, 1947, the day the picketing began, fifteen or twenty new girls were hired at the laundry.

During June, July and August, 1947, the Union obtained the signatures of twenty-four or twenty-five laundry employees on these authorization cards. During that time many employees presented grievances to the Union, and the Executive Board of tthe Union interceded with Brown in behalf of these discharged and dissatisfied employees, attempting to settle their difficulties. Brown advised the Board that he had no authority to deal with them, and that they should see Cox.

These Union officials made two trips to Houston to confer with Cox. He likewise told them Brown had no authority regarding labor disputes. These officials presented the signed authorization cards to Cox and claimed they represented a majority of the laundry employees. Cox agreed to permit them to represent the individuals from whom they had authorization cards, but he refused to recognize the Union as the collective bargaining agent of all the employees. Then the parties agreed that the Union should petition the National Labor Relations Board to conduct an election and determine whether the Union should be certified as the collective bargaining agent for the laundry employees.

The Union thereupon sent its petition to the National Labor Relations Board. In August, the exact date not being shown, that Board replied that it was doubtful whether it had jurisdiction of the case. the reason for that attitude was not disclosed, but presumably it was because the laundry was not engaged in interstate commerce. Cox was not informed of this reply. Meanwhile, representatives of the Union and Cox had a conference in which it was decided to permit the employees to conduct an election to determine how many favored unionization. On August 18, 1947, Cox visited the laundry, and, in the presence of the Union representatives, addressed his employees, disavowing any intention to discriminate against those who desired to join a union. At that time one of his employees protested to him about her wages being reduced. Later that same day, the employees conducted the election, which resulted in a fifteen to fifteen tie vote.

On Friday before the election on Monday, Brown reduced the wages of Miss Ethel B. Sifford from forty cents to thirty-five cents per hour, and told her if she did not like his action, he would reduce them again. At about the same time he also reduced the wages of Mrs. Priscilla McCafferty from forty-seven cents to forty cents per hour. These women had been engaged in some union activities, but no reason was shown for the reduction in their wages.

■■ Within an hour after the election, Brown discharged Miss Dorothy Krieger, who had voted for unionization and signed her ballot. The next day, Mrs. Lucille Duggar protested to Brown over the discharge of Miss Krieger, and she was also discharged. The Union business agent, who was present at the laundry at that time, protested to Brown, but Brown refused to rehire either of the women. Thereupon, some of the employees went out on a strike. They were told by Brown if they struck they were "automatically fired". In this group was Miss Nannie Mae Day and Miss Anna May Williams. Immediately thereafter the petitioners began picketing on the sidewalks in front of the laundry, carrying placards furnished by the Union. The wording on the placards was not revealed by the evidence, but respondent alleged that they carried announcements that the laundry was unfair to organized labor. No claim was made that they were libelous in character, and in the absence of any proof we cannot presume that the language used was worse than alleged by respondent. Such slogans have been determined to be "a part of the conventional give-and-take in our economic and political controversies", and are not to be construed as falsifying facts. Cafeteria Employees Union v. Angelos, 320 U. S. 293, 64 Sup. Ct. 126, 88 L. Ed. 59.

The picketing was conducted by the employees of the laundry, and included Miss Krieger and Mrs. Duggar, who had been discharged immediately theretofore; Mrs. McCafferty and Miss Sifford, whose wages had been reduced; and Miss Day and Miss Williams, who walked off the job about the time the picketing began. All of these, except Miss Krieger, were parties to the suit and are petitioners here.

The picketing lasted for four or five days. It was at all times peaceful, and was conducted by no more than two persons at one time. On the fourth or fifth day after the picketing began, the trial court issued a restraining order, which, in later hearings, ripened into a permanent injunction prohibiting the picketing.

■ After the picketing began, at some time not definitely shown, the Union had several hundred circulars distributed in Velasco and the adjacent town of Freeport. The contents of the circular are fully set out in the opinion of the Court of Civil Appeals. It contained statements as to alleged deplorable and intolerable working conditions and relations between the laundry and its employees, and, among other things charged that the employees "had been subjected to the indignity of profane and abusive language." The Court of Civil Appeals found that all

of the defamatory statements in the circular were untrue, and the trial court is presumed to have so found, except for such statements as are supported by uncontroverted testimony. Though some of the statements are strongly supported by the evidence, most of them were controverted by Brown, particularly those with reference to profane and abusive language. We must therefore presume that the circular was defamatory. The Court of Civil Appeals also found that the circular was distributed to the public in the vicinity of the laundry, and concluded that the injunction against the picketing was justified by reason of the circular alone; and that holding was made notwithstanding the fact that no relief was asked for, and none granted by the trial court, by reason of it.

The testimony wholly fails to support the finding of the Court of Civil Appeals, or any implied finding of the trial court, that the circular was distributed in the vicinity of the laundry. Only one witness was interrogated about the circular. She was Miss Nannie Mae Day, and her testimony was that she distributed the circular "down town", but not in front of the laundry. Nor was it shown that anyone else distributed them near the laundry, or that their distribution was in any manner connected with the picketing. Under those circumstances, and since no relief was sought or granted with reference to the circular, it has no place in this suit and lends no legality to the injunction. For that reason it shall not be further noticed.

The Court of Civil Appeals further found that there was no labor dispute between the petitioners and the respondent, and that none of the petitioners was an employee of the laundry at the time of the picketing. These holdings were obviously made by reason of the provisions of article 5154f, Vernon's Ann. Civ. St., the pertinent portions of which are as follows:

It shall be unlawful for any person or persons, or association of persons, or any labor union, incorporated or unincorporated, or the members or agents thereof, acting singly or in concert with others, to establish, call, participate in, aid or abet a secondary strike, or secondary picketing, or a secondary boycott, as those terms are defined herein.

"Secondary strike" shall mean a temporary stoppage of work by the concerted action of two or more employees of an employer where no labor dispute exists between the employer and such employees, and where such temporary stoppage results from a labor dispute to which such two or more employees are not parties.

The term "picket" shall include any person stationed by or acting in behalf of any organization for the purpose of inducing anyone not to enter the premises in question; or for apprising the public by signs, banners, or other means, of the existence of a labor dispute at or near the premises in question; or for observing the premises so as to ascertain who enters or patronizes the same; or any person who by any means follows employees or patrons of the place being picketed either to or from such place so as to either observe them or to attempt to persuade them to cease entering or partonizing the premises being picketed.

The term "secondary picketing" shall mean the act of establishing a picket or pickets at or near the premises of any employer where no labor dispute, as that term is defined in this Act, exists between such employer and his employees.

The term "secondary boycott" shall include any combination, plan, agreement or compact entered into or any concerted action by two or more persons to cause injury or damage to any person, firm or corporation for whom they are not employees, by

(1) Withholding patronage, labor or other beneficial business intercourse from such person, firm or corporation; or

(2) Picketing such person, firm or corporation; or

(3) Refusing to handle, install, use or work on the equipment or supplies of such person, firm or corporation; or

(4) Instigating or fomenting a strike against such person, firm or corporation; or

(5) Interfering with or attempting to prevent the free flow of commerce, or

(6) By any other means causing or attempting to cause an employer with whom they have a labor dispute to inflict any damage or injury to an employer who is not a party to such labor dispute.

The term "employer" means any person, firm or corporation who engages the services of an employee.

The term "employee" shall include any person, other than an independent contractor, working for another for hire in the State of Texas.

The term "labor dispute" is limited to and means any controvery between an employer and the majority of his employees concerning wages, hours or conditions of employment; provided that if any of the employees are members of a labor union,

a controversy between such employer and a majority of the employees belonging to such union, concerning wages, hours or conditions of employment, shall be deemed, as to the employee members only of such union, a labor dispute within the meaning of this Act.

Any person who violates any of the provisions of this Act shall be liable to the person suffering the same for all damages resulting therefrom, and the person damaged is hereby given right of action and access to the courts to redress such wrong or damage, including injunctive relief; and any association or labor union, local, state, national or international, which represents or purports to represent any such person violating any of the provisions of this Act shall be jointly and severally liable with any such person for all such damages resulting thereby.

It will be noted that the statute seeks to restrict a "labor dispute" to a controversy between an employer and a majority of his employees, or, where unionized, between an employer and a majority of the union members. In the absence of this requirement it is obvious from the above facts that a labor dispute existed, and we so find as a matter of law. It is conceded, however, that none of the employees of the laundry belonged to a union, and that less than a majority had a controversy with the laundry concerning wages, hours or conditions of employment. Thus, under the statutory definition, it is apparent that no labor dispute existed. Nevertheless, the petitioners insist that the statutory provision prohibiting picketing and boycotting, unless the employer and a majority of his employees are in dispute as to wages, hours and working conditions, violates the right of "freedom of speech" guaranteed by the Fourteenth Amendment to the Constitution of the United States.

■ No reason was assigned by the Court of Civil Appeals for its finding that none of the petitioners was an employee of the laundry. The testimony is uncontroverted that the picketing was done by those who had been employed by the laundry prior to the time they went on strike and began the picketing. Therefore, the Court of Civil Appeals must have concluded that they ceased to be employees under the statute when they went on strike or were discharged by the manager. We cannot agree with such a narrow or restricted construction of the statute. A laborer on strike has not abandoned his employment; he has only ceased from his labor. Iron Molders Union v. Allis Chalmers, 166 Fed. 45 (91 CCA 631) 20 L. R. A. (N. S.) 315 (CCA 7, 1908) ; Teller, Labor Disputes and Collective Bargaining, Sec. 79, p. 237; 29 U. S. C. A. Title 29, Ch. 7, Sec. 152. Nor has his status changed

when he is discharged because of his expressed dissatisfaction over wages, hours or working conditions. To hold that a laborer ceases to be an employee when he strikes in protest of working conditions, or when he is discharged for union activities, would place in the hands of the employer complete control over labor controversies and would prevent a "labor dispute" from ever arising against his will. That, of course, would result in an intolerable situation, which was not the intent of the law, and for the purpose of this opinion, we must proceed upon the theory that these striking and discharged persons were still employees of the laundry.

■ We now pass to the constitutionality of the statutory provision limiting the term "labor dispute" to controversies between an employer and a majority of his employees. In approaching that question it should be kept in mind that we are dealing with a situation where the picketing was entirely peaceful, unaccompanied by intimidation, threats, coercion or violence in any particular, and conducted by no more than two persons at one time.

We recognized in Ex parte Henry, 147 Texas 315, 215 S. W. (2d) 588, that the right to peaceful picketing is one phase of the right of free speech guaranteed by the First Amendment to the Constitution of the United States, which, under the Fourteenth Amendment, no state can abridge. In that case a number of decisions of the Supreme Court of the United States are discussed at length in an endeavor to outline the extent of this constitutionally protected right. There is also an able and exhaustive discussion of these cardinal cases in the current issue of the Baylor Law Review. Baylor Law Review, Vol. 1, No. 2, p. 106. No useful purpose could be served in again discussing those decisions in detail.

Briefly stated, it is settled by them that "publicizing the facts of a labor dispute in a peaceful way through appropriate means, whether by pamphlet, by word of mouth or by manner, must now be regarded as within that liberty of communication which is secured to every person by the Fourteenth Amendment against abridgment by a state". Thornhill v. State of Alabama, 310 U. S. 88, 60 Sup. Ct. 736, 84 L. Ed. 1093; Carlson v. State of California, 310 U. S. 106, 60 Sup. Ct. 746, 84 L. Ed. 1104.

In Milk Wagon Drivers Union v. Meadowmoor Dairies, 312 U. S. 287, 61 Sup. Ct. 552, 85 L. Ed. 836, 132 A. L. R. 1200, it was held that picketing may be enjoined when it is "enmeshed with contemporaneously violent conduct"; but in the course

of the opinion the court stated that it was not qualifying, but reaffirming, the Thornhill and Carlson decisions, involving picketing without violence.

In Bakery and Pastry Drivers v. Wohl, 315 U. S. 769, 774, 62 Sup. Ct. 816, 86 L. Ed. 1178, 1183, the Supreme Court of the United States held that neither the legislature nor the courts of a state may narrowly define the term "labor dispute" so as to deprive employees of their constitutional right to speak, assemble or picket. From that decision we quote:

"So far as we can ascertain from the opinions delivered by the state courts in this case, those courts were concerned only with the question whether there was involved a labor dispute within the meaning of the New York statutes and assumed that the legality of the injunction followed from a determination that such a dispute was not involved. Of course that does not follow: one need not be in a 'labor dispute' as defined by state law to have a right under the Fourteenth Amendment to express a grievance in a labor matter by publication unattended by violence, coercion, or conduct otherwise unlawful or oppressive."

The same court extended the rule even farther in the case of American Federation of Labor v. Swing, 312 U. S. 321, 326, 61 Sup. Ct. 568, 570, 85 L. Ed. 855, 857. In that case the court was asked to sustain a decree of a state court which had held there could be no "picketing or peaceful persuasion" in relation to any dispute between an employer and a trade union unless the employer's own employees were in controversy with him. In that case no workman of the employer was engaged in the picketing. It was conducted by union members who were in the same industry but were employed by other employers. In refusing to adopt the narrow view of the state court, the Supreme Court of the United States said:

"The scope of the Fourteenth Amendment is not confined by the notion of a particular state regarding the wise limits of an injunction in an industrial dispute, whether those limits be defined by statute or by the judicial organ of the state. A state cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him. The interdependence of economic interest of all engaged in the same industry has become a commonplace."

■ Under the plain mandate of the above Federal decisions, we must necessarily hold that the Legislature of this State cannot

deprive our citizens of the right of peaceful picketing by narrowly defining a "labor dispute" as a controversy between an employer and not less than a majority of his employees. American Federation of Labor v. Bain, 165 Or. 183, 106 Pac. (2d) 544, 130 A. L. R. 1278. To so restrict the term would deny to the minority valuable rights guaranteed by the Constitution, and by reason of the definitions given by the statute to "secondary strikes", "secondary picketing", and "secondary boycott", those minorities would be subjected to the penalties and liabilities provided in the statute if they sought to publicize their grievances. However, it should not be understood that the states are without authority to enact reasonable regulations for picketing so long as these regulations do not deprive the citizens of his fundamental rights. It cannot be doubted that under the police power the states may impose certain reasonable restrictions even upon peaceful picketing provided they are not destructive of the right to publicize a labor difficulty. They may reasonably regulate the number of pickets, the conduct and demeanor of such persons, the terminology of the placards used in informing the public of the facts of the controversy, and reasonably define the dispute which may justify the activity. That is clearly indicated in the Thornhill case wherein the Supreme Court was careful to point out that the statute there condemned "leaves room for no exceptions based upon either the number of persons engaged in the proscribed activity, the peaceful character of their demeanor, the nature of their dispute with an employer, or the restrained character and accurateness of the terminology used in notifying the public of the facts of the dispute."

The fundamental constitutional rights which the Supreme Court of the United States upheld in the above decisions was declared to be secured to "every person". Thus there is no escape from the conclusion that the denial of such right to the members of the minority is no less an unconstitutional abridgment of the right simply because it is saved to the majority. On what theory may the distinction be justified? Does one lose his constitutional guarantee merely because he aligns himself with the minority group? Are rights less sacred to a small group than they are to the multitude? Was not one of the dominant purposes of the Constitution to protect minorities from the unlawful and avaricious encroachments of majorities? Surely the framers of our Constitution had no thought that rights guaranteed to the many should be denied to the few.

■ As reluctant as we are to declare acts of our Legislature unconstitutional, it becomes our duty to declare invalid that portion of the statute involved which seeks to restrict a "labor

dispute" to a controversy between an employer and a majority of his employees. In arriving at this conclusion we do not wish to be understood as holding other provisions of the above quoted Act are unconstitutional, nor that picketing may not be prohibited by injunction when there is no industrial dispute. The Swing case does not go that far. It merely holds that the labor controversy may not be restricted to the immediate employees of the employer, but may be extended to others in the same industry who are injuriously affected by unsatisfactory economic conditions in the plant or business of another. In every case of justifiable picketing in labor cases an industrial dispute must exist, and the dispute must have a reasonable connection with the business picketed; and in no event is picketing lawful unless there are reasonable grounds therefor. Carpenters and Joiners Union v. Ritter's Cafe, 315 U. S. 722, 62 Sup. Ct. 807, 86 L. Ed. 1143. We are recognizing that principle in the case of Northeast Texas Motor Lines, Inc., v. Dickson, 148 Texas 35, 219 S. W. (2d) 795, which we are reviewing and deciding simultaneously with this case. It is to be distinguished upon the simple proposition that no valid controversy existed under the facts of that case. But once the controversy legally arises the Legislature cannot deny the employees the right to picket peacefully within due bounds merely because only a few are aggrieved or become activated. That is the constitutional abridgment which we here condemn.

From what we have said it follows that the picketing was lawful and should not have been enjoined. Since the damages, if any, resulted from the exercise of lawful and constitutionally guaranteed rights, they are damnum absque injuria, as is insisted by the petitioners in their brief filed in this court.

Therefore, the judgments of both courts below for the injunction and for damages are reversed and judgment is here rendered that the respondent take nothing.

Opinion delivered March 23, 1949.

ON REHEARING.

PER CURIAM:

In view of the motions for rehearing we emphasize that Article 5154f, Vernon's Ann. Civ. St., is held invalid only in so far as it operates to deprive the petitioners of the right of free

speech as defined by the decisions of the Supreme Court of the United States.

The motion for rehearing is overruled.

Opinion delivered May 11, 1949.