INTERNATIONAL ASSOCIATION OF MACHINISTS et al., Appellants,

v.

CENTRAL AIRLINES, INC., Appellee.

No. 16297.

Court of Civil Appeals of Texas.

Fort Worth.

Feb. 23, 1962.

Rehearing Denied April 13, 1962.

Herrick & McEntire, Fort Worth, Plato E. Papps, Chief Counsel, International Ass'n of Machinists, Washington, D. C.,

Mullinax, Wells, Morris & Mauzy and Charles J. Morris, Dallas, for appellants.

Mueller & Mueller, Hudson, Keltner, Jordan, Smith & Cunningham and Luther Hudson, Fort Worth, for appellee.

MASSEY, Chief Justice.

Plaintiff union and numerous individuals brought suit against the defendant airline company for damages accrued as the result of their wrongful discharge from an employer-employee relationship, formerly existent between the individuals and the company, in breach of union contract existing at the date of discharge, for a writ of injunction which would restore the individuals to their former jobs and for general relief. Additional complaint, by the union in behalf of all employees of the company represented by it, was because of the company's practice, begun on and after the date claimed as that of the individuals' wrongful discharge, of contracting out maintenance work on its aircraft. Such work had formerly been performed by the company on its own premises by its own employees.

Trial was before the court without intervention of a jury, and judgment was rendered against the individuals and the union and in behalf of the company. No findings of fact or conclusions of law were requested or filed. An appeal was taken to this court.

Judgment affirmed.

The individuals bringing the suit had been among that category of employees of the company represented by the union under a contract in effect between the union and the company on date of April 7, 1958. On said date the union called a strike, in which all of said individuals participated, because of certain mistreatment the union believed the company had afforded six of its employees (not the individuals considered in this suit) growing out of said employees' refusal to work overtime on one of its aircraft.

It would be well to understand the affair of the six employees in question, so we will attempt to briefly state it.

On April 4 and 5, 1958, the six employees were served by the company with written notice that they were each "suspended from service" and instructed to present themselves at 8:00 o'clock on the morning of April 7, 1958, at the office of the company's director of maintenance. The company, through its said director, intended to question the employees concerning their reasons for refusing to work overtime on the aircraft. The employees appeared on the company premises as requested, though they were not on the payroll of the company in view of their "suspensions". Union representatives, one a co-employee of the men appearing and one not an employee, presented themselves along with those the company had directed to appear. The company insisted that it was entitled to talk to the men individually and privately. The men and the union representatives insisted that the company did not have the right to do so. There was a refusal on their part that any such interview be held. While it was not defined as such, we believe that the union was contending that what the company desired amounted to a "step" in the grievance procedure of the contract between the company and the union, while the company was contending that it did not amount to such a "step". Be that as it may, we are convinced that in view of the fact that the individuals were under discipline imposed by the company in view of their suspensions, they were entitled to refuse any interviews without benefit of the presence of an advisor if they so chose. They did so choose, and the company would not accede, whereupon they left the premises.

Section 22, entitled "Investigation and Discipline", is the part of the contract which was in effect between the company and the union which the union believed to have been invoked by the company, and which the company did not consider to

have application. Material portions thereof read as follows: "(a) Hearing. 1. An employee shall not be disciplined or dismissed from the service of the Company without notification in writing of such action. An employee who is disciplined or dismissed shall be entitled to an investigation and hearing thereon, provided that such employee makes written request for such investigation and hearing within seven (7) days after receiving such notification. 2. An employee may be held out of service by the Company pending such investigation and hearing and appeals therefrom * * *. 4. Prior to such investigation and hearing, such employee shall be notified in writing by the Company of the precise charge or charges against him. He shall be given the necessary time, not exceeding seven (7) days, in which to secure the presence of witnesses and shall have the right to be represented by the employee of the Company of his choice or by his duly accredited representative or representatives. 5. Such investigation and hearing shall be held by a maintenance supervisor of the Company, designated by the Company for that purpose, and shall be held within seven (7) days after the receipt of the employee's written request therefor." Further provisions prescribe time schedules within which decisions are to be rendered, and for appellate steps and decisions and forms thereof through the company and thence before the Central Airlines, Inc. Mechanics' System Board of Adjustment.

As a matter of information, it is to be noted that each of the six individual employees, after the events heretofore mentioned, filed their written request for an investigation and hearing under the provisions of Section 22(a) 1 of the aforesaid contract. These were honored and processed by the company in accordance with the other provisions of said section.

The union and other employees of the company did not wait until the individual employees filed such written request for investigation and hearing. Obviously they were incensed at the attitude of the company and its representatives on the morning of April 7th. A union meeting was called for a time later in the day at which the majority present proceeded erroneously upon the supposition that the company had breached the provisions of the union contract by refusing to proceed with the interview it had requested of the suspended individuals in and with the presence of one or more representatives of the union. Although it should have been clear to anyone with the slightest legal training that the company had not breached the contract, the union and its membership certainly in the best of faith, reached a conclusion to the contrary. By wire the following notice was prepared and served upon the company, " * * * your failure to comply with section 22 which calls for the presence of a union representative in a suspension hearing involving * * * (is) such a material breach of the agreement that we have no alternative but to exercise the rights reserved for us in engaging in concerted action to protect the agreements from such continuing violations the above mentioned employees as well as those engaging in concerted action are ready willing and able to comply with section 7 of the agreement which does not call for forced overtime employment. Your attempt to impliedly write into the contract a forced overtime provision is in strict violation of section seven of the agreement."

A strike was called and the great majority of the union employees failed to present themselves for work on the following day, April 8, 1958. The union put out a picket line at the company's plant. It was not honored by the members of other unions. The company publicized the fact that it was taking applications to fill the strikers' jobs and began hiring new employees as permanent replacements. The company also negotiated contracts with private contractors for work to be done away from its premises.

Neither the company nor the union sought any relief through the machinery of the courts, or through any grievance procedure

of the contract or under the provisions of the Railway Labor Act. As previously indicated, a request for hearing was filed by or in behalf of the six suspended employees, and the company was careful to proceed thereupon in strict compliance with the provisions of the union contract. At all times the company treated the contract as one continuing in effect.

The strike lasted ten days. During that period the company representatives met with the union representatives, and at the meetings the union took the position that since the six suspended employees had been granted a hearing and representation as provided by Section 22 of the contract, the purpose of the strike had been accomplished. The union caused a notice to be delivered to the company which stated in part as follows: "Due to the fact that the suspended employees were granted Union representation, the denial of which precipitated the above mentioned work stoppage, I have ordered all the employees to report to work at 8:00 A.M., Thursday, April 17, 1958."

There was no written agreement in settlement of the strike, and there were no oral commitments by the company regarding the restoration to duty of all or any of them. The company merely stated that it would take each individual as he appeared and process his case. The union chose not to continue the strike until such time as any terms might be agreed upon, but ordered the men to report to the company, which they did. As the men appeared, the company processed them as applicants for employment in the same or near-identical manner as it ordinarily processed an applicant for employment who had not theretofore been in an employer-employee relationship with the company. The company adopted the position, which it was careful at all times to maintain, that when the strikers left and set up the picket line they had "quit" their respective employments, and had themselves severed the employer-employee relationship existent immediately prior to the time they had gone on strike.

The company restored some of the strikers to the same jobs at the same pay, some of them to jobs of a lower classification at reduced pay, but fifty-three were not re-employed at all. None of the strikers were ever served with notice of "discharge" either orally or in writing. It is to be remembered that section 22 of the union contract provides that any "discharge" from the employer-employee relationship must be by way of a service of notification in writing, and that subject thereto the individual dismissed has the right to apply for and receive an investigation and hearing.

Not being restored to service at any work whatever, the fifty-three aforementioned individuals did file, within seven (7) days, grievance forms in which substantially the following uniform statement was made: "I have been unjustly held out of service since I reported for work at 8 A.M. on Thursday, April 17, 1958. In accordance with Section 22 of the current I. A. of M.—Central Airlines, Inc. Agreement, I request that I be reinstated without loss of seniority rights and that I be paid for all loss of pay involved." Albeit contesting at every step the right of any of the fifty-three to be heard and considered as a person entitled to the procedure afforded by section 22 of the contract, the company honored the "steps" for grievance procedure set forth thereunder, in so far as any "step" required action by anyone within the company's power to furnish or control. Admittedly the company delayed proceedings in every way and at every opportunity, being careful to barely "skate inside" the boundaries beyond which it would be safe for it to go without jeopardy to its avowed contentions.

Despite attendant delays the grievances were processed step-by-step up until they reached the point where the union (and the individuals) petitioned the National Mediation Board for a neutral referee to make a decision in the case. Such was a "step" in grievance procedure preliminary to any finality of decision under the provisions of the contract and the Railway Labor Act.

At no point did the company so act or refuse to act as to block orderly processing of the cases, and indeed to do so would not be within its power, albeit, as already mentioned, it delayed matters when it could and it at all times contested the right of jurisdiction of those provided and/or required to make determinations—under the theory that the employer-employee relationship which had formerly existed between it and the strikers was voluntarily severed by the employees themselves as the result of their unilateral unlawful strike action. After having petitioned for a neutral referee the union (and the individuals) withdrew application therefor (and for further action under grievance procedure). The suit in district court was filed.

At all times prior to filing the suit the contention of the union and the individuals was that the employer-employee relationship between the company and the individuals persisted up until the time any further grievance procedure was authorized and permissible as applied to the matter upon which grievance was filed, and that the individuals were merely "out of service", and wrongfully held in such state of suspension by the company. In filing the suit, on February 29, 1960, they apparently accepted the contention of the company that the employer-employee relationship was in fact severed, at least as of the date of April 17, 1958, when they appeared and presented themselves as available to perform the duties of their employment. Thus they attempted, by agreement to be implied, to yield in their first contentions upon being "held out of service" and to narrow the issue to a question of whether the severance of the employer-employee relationship was the fault of the company in that it wrongfully "discharged" them, or whether it was their own fault in that they "quit" their employment relation. We entertain considerable doubt, under the circumstances, of the propriety of either party's attempt to retroactively fix the men's status as one in which the employer-employee relationship did not exist.

Despite the fact that the union and the strikers ultimately offered to agree and concede that the employer-employee relationship was terminated in April of 1958, we believe it would be wise to examine the state of the law.

The law of the case is provided in the Railway Labor Act—Carriers by Air, U.S. C.A. Title 45 "Railroads", ch. 8, §§ 151–188.

Under the Act it is provided in both section 152 and section 159 that nothing contained in the Act shall be construed to make the quitting of his labor or service by an individual employee an illegal act. To us the meaning of this encompasses the congressional intent that although an individual employee engages in collective action, as in a strike, his status continues to be that of an employee, even though the collective strike activity in which he has engaged may be illegal within the purport of the Act. Furthermore, it means that no such individual employee may be treated and considered as having quit his employment, or as having severed his relation to his employer as an employee, but conversely must be treated and considered as having ceased from his labor or having held himself "out of service" on a temporary basis. A like distinction was recognized by the Supreme Court of Texas in the case of International Union of Operating Engineers Local No. 564 v. Cox, 1949, 148 Tex. 42, 219 S.W.2d 787. In view thereof it would appear that it would only be in instances of discharge, acknowledged as such, that a period could be considered to have begun for which damages could be sought under the theory that the discharge was wrongful.

By striking it may be that an individual employee may abrogate certain of his rights under the contract to which he is privy as a member of a union which negotiated it, but, in view of the Act, his right to have his status as an employee would in every case persist and would not be totally altered solely on account of the fact that he had engaged in a strike, regardless of its legality or illegality. If he

he discharged because he was or had been a striker he would be entitled to elect as to whether he preferred to file a grievance subject to appeal to the ultimate appellate body constituted within the contemplation of the Railway Labor Act in seeking reinstatement, plus damages perhaps,—or preferred to honor and accept the discharge and sue for immediate relief in the form of damages.

■ Under the circumstances of this case we are of the opinion that because of the fact that the collective strike action was contrary to the intent and purpose of the Railway Labor Act, and therefore unlawful, yet, for purposes of the Act, each individual striking member of the union must be considered to have thereafter continued in his status as an employee, albeit one who has voluntarily held himself "out of service", for none of them quit or were discharged from the "employee" status.

■■ Consideration may well be given to a determination of whether the case before us has grown out of a labor dispute properly characterized as a "minor dispute", enjoinable by the courts, or as a "major dispute", not subject to injunction. Referring to the case of Elgin, J. & E. R. Co. v. Burley, 1945, 325 U.S. 711, at page 723, 65 S.Ct. 1282, at page 1290, 89 L.Ed. 1886, and considering the nature of the dispute over which the union called the strike, it is readily determined that the strike arose over a "minor dispute", i. e., at most one in which the union and its membership contended for interpretation or enforcement of contractual rights previously agreed upon, rather than to create any new contractual right.

Under the present state of the law applicable to the transport industries a strike called over a "minor dispute" between management and labor may be enjoined to prevent a tie-up of transportation facilities. The primary purpose of the Railway Labor Act is to avoid interruption of commerce by providing for orderly, peaceful settlement of such disputes, which form of settlement is by the Act made the duty of both labor and management, in §§ 152 and 184 under procedure prescribed and made enforceable under provisions of these sections and §§ 153, 155 and 185.

It is obvious from the circumstances of this case that the union, in calling the strike, elected to abandon recourse to the machinery afforded by the Act and to penalize the company by economic coercion. The company elected to refrain from seeking to combat the union's strike activity through injunctive procedure, but instead sought to accommodate itself to the condition confronting it by allaying its problems in hiring new employees and contracting out certain of the work it had formerly handled.

Conceding arguendo, that the strikers who were not returned to work were and continued to be its employees, and that its relation to them was as employer to employee, regulated by the provisions of the union contract, the company asserts as binding upon them their presentation of their grievances through procedure afforded under the contract itself and under the Railway Labor Act. Ergo, says the company, since the last decision under the grievance procedure was against the contentions of the union and the strikers who were not returned to service, and since they abandoned further available "steps" in the grievance procedure, such last decision had become final and they are without standing in the courts and the relief prayed for is foreclosed.

In connection with such contention of the company we are of the opinion that it is correct and should be sustained and that the cause of action of the union and the individuals might have been properly dismissed. Sarran v. Missouri Pacific Railroad Company, 1959 (Tex.Civ.App., San Antonio), 330 S.W.2d 925, error refused; Union Pacific R. Co. v. Price, 1959, 360 U. S. 601, 79 S.Ct. 1351, 1355, 3 L.Ed.2d 1460.

Except for the fact that we believe the proper order in the trial court might have been dismissal of the cause had the com-

pany moved for a dismissal, the judgment should be one affirming the denial of relief for the same reasons.

▮ Assuming there would be no question of propriety for this court to consider that it possessed the right to act in all respects rather than merely upon the right to damages, it would seem that if we could, and were to sustain the union and the strikers who were not reinstated in service—would oust from their jobs those new employees who went to work for the company while the illegal strike was in progress. We believe that as applied to the strikers, whose jobs were filled during the time they were voluntarily holding themselves out of service, their rights under the union contract should be considered to have been abrogated, at least to the extent of any senority right to jobs filled by the new employees, when they resorted to a strike rather than to the grievance procedure of the contract. Indeed, it appears that the newly hired employees came under the jurisdiction of the union contract upon their employment by the company, or at least shortly thereafter, and their own rights would be those specified by the same contract. It is to be noticed that the company never at any time treated the contract as having been wholly abrogated, and even during the progress of the strike proceeded to honor its processes for the handling of the grievances of the six suspended employees as to whom the dispute arose culminating in the strike.

Since the Act requires the strikers to be individually considered, we may hypothesize the situation as follows: No. 1 employee refuses to perform the service for which he is employed by the company and holds himself "out of service" pending satisfaction demanded of the company. While the situation persists No. 2 applicant, presents himself for employment and certifies himself ready to perform the job in question, and the company enters into the employer-employee relationship with him and he begins to perform service on the job from which No. 1 absented himself. Should No.

1 present himself to the company and certify his readiness to resume the duties of his employment on such job, withdrawing his previous demands, is the company in duty bound to restore him to the job despite the fact that to do so would require it to hold No. 2 "out of service"?

We think not. If the company were so required, No. 1 would be afforded the opportunity to continue on the job until he was assured that the services of No. 2 were no longer available to the company, whereupon he could again hold himself absent as "out of service" until the company met the same demands, once withdrawn but now reasserted. By this means would be placed within the power of No. 1 all the weapons of economic coercion, while at the same time the company would be deprived of all rights to maintain itself as applied to the job which should be performed if its commerce is to continue within the contemplation of the Railway Labor Act. Of necessity it would appear that principles of equity would have application, the exigencies of which would warrant the company in continuing the period as to which No. 1 was "out of service" so long as the job is filled by No. 2 in the satisfactory rendition of service. This would have special application to an instance where there was no specific provision of the contract under which employment was conducted which would require the discharge or holding "out of service" of the employee who would be in the position of No. 2 in the situation hypothesized. There is no such specific provision in the contract considered in the instant case.

Of course nothing hereinabove stated should be construed to have any application or effect in any instance of a general strike where, pursuant to a new contract or agreement made in settlement thereof, agreements are entered into which would fix employment rights and seniority as between those who had engaged in the strike and those who were newly employed during the period of the strike.

 As applied to that part of the contention which relates to the work being contracted out by the company to maintenance contractors on premises away from those of the company, we take occasion to note that the contract upon which the contention is asserted has no application to work performed on premises other than that of the company, save and except work performed elsewhere by the company's own employees. Furthermore, this was a subject of grievance which was filed along with those relating to the fifty-three strikers and which was abandoned after once begun and carried through the majority of the "steps" in grievance procedure prior to the filing of the suit. What we have already said relative to the binding effect of the election by the union and employees to proceed under grievance procedure would apply to this matter as well.

We have heretofore mentioned that the company at all times refused to recognize and consent that there would be any jurisdiction of the cases filed under the grievance procedure in the various boards and bodies, prescribed by the contract and by the Act to consider grievances. There is a point of error grounded in the contention that the trial court erred in failing and refusing to find that the company violated the contract by such refusal.

This matter is not material. The Company's act could be no more than a challenge of jurisdiction. Just as in instances of litigation in the courts jurisdiction may be attacked as to the persons or as to the subject matter and the challenge so presented sustained or denied. Even when it is ultimately determined that the challenge is groundless, he who made the challenge has lost nothing to which he was entitled, although conceivably he might have failed to gain something to which he would have been entitled had he claimed it. He is certainly not estopped to make his other defenses. Jurisdiction, if it exists, is not impaired by a contention that it does not exist, and one who successfully resists a contention that jurisdiction does not exist gains nothing except a ruling which sustains the jurisdiction.

It will be obvious to counsel for the litigants on this appeal that in some instances the points of error have been sustained, and in other instances they have been overruled. In no instance, however, would the effect of sustaining a point be to establish any error which would require a reversal of the judgment of the trial court.

Judgment is affirmed.

RENFRO, Justice.

I concur in the affirmance of the judgment.