THERMOTICS, INC. and Well Control, Inc., Appellants,

v.

BAT-JAC TOOL COMPANY, INC., et al., Appellees.

No. 16791.

Court of Civil Appeals of Texas, Houston (1st Dist.).

Sept. 2, 1976.

Bracewell & Patterson, J. Clifford Gunter III, William Ikard, Houston, for appellants.

Boswell, O'Toole, Davis & Pickering, John C. Pavlas, Donald R. Hallmark, Houston, for appellees.

PEDEN, Justice.

This is an appeal from the denial of a temporary injunction in a trade secrets case. Thermotics, Inc. and Well Control, Inc. brought this action against Bat-Jac Tool Company, Inc., Albert L. Batson, George M. Clark, Travis L. Samford, Mark Gekas, L. L. Machine Works, Inc., and L. L. Byrne.

Thermotics and its wholly-owned subsidiary, Well Control, develop, design, manufacture, research, improve, and market oil field tools and equipment. One of their products is a suspension drilling tool used to prevent drill bits or pipe from sticking. It is marketed by Well Control as the "Hill Suspension Drilling Tool" or the "Wellco Rotary Drilling Tool" (Hill Jar).

Batson, George Clark, and Samford are former employees of Well Control, having been vice president and general manager, chief engineer, and international salesman, respectively. While still employed by the

appellants they organized and incorporated the Bat-Jac Tool Company. It offers for sale and lease the Battering Ram, a rotary drilling tool like the plaintiffs' Hill-Jar. Gekas was formerly a secretary to Batson at Well Control and is now employed by Bat-Jac. L. L. Machine Works is a machine shop owned by Byrne; it manufactures and fabricates the Hill Jar for the appellants and the Battering Ram for Bat-Jac.

Appellants alleged in their original petition and application for temporary and permanent injunction that Bat-Jac, Batson, Clark, Samford, Gekas and the remaining defendants conspired to appropriate for their own use the "proprietary information" furnished in confidence to them by the appellants, including trade secrets concerning the Hill Jar, its manufacture and sale, as well as trade secrets concerning appellant's products which are still in the design stage. They further state that the appellees have employed those trade secrets in the production, manufacture and sale or rental of the Battering Ram, which is identical to the Hill Jar, all to the appellants' irreparable harm and detriment.

The appellants' seven points of error assert that the trial court erred and abused its discretion in refusing to grant their application for a temporary injunction because:

1.  the process by which the Hill Jar and the appellants' other tools and equipment are fabricated, manufactured, and marketed are the appellants' trade secrets;

2.  the appellees illegally appropriated those trade secrets by the breach of confidence placed in them by the appellants;

3.  the record conclusively shows that the appellants established a probable right and a probable injury; .

4.  the appellants have no remedy at law;

5.  the balance of the equities is in favor of the appellants;

6.  the appellants came before the trial court as plaintiffs with clean hands; and

7.  the appellants will suffer irreparable injury during the interim unless the temporary injunction is granted.

The appellants contend that it is not in the Hill Jar, as patented, that they claim trade secret rights but in the process by which the improved Hill Jar was designed, assembled, and marketed.

We review the testimony.

J. D. Kimmel, president of Thermotics and Well Control, started Thermotics in 1967, and Thermotics purchased Well Control in 1968. Well Control's principal products are a degasser and a down-hole drilling jar, the drilling jars being manufactured by a contract machine shop, L. L. Machine Works. Those who buy them are the major oil companies and major drilling contractors. Domestically, the company primarily rents the jars, usually by the day. It both sells and rents Hill Jars in the international market. They range in size from 3½ inches in diameter to 12 inches, and they are several feet long. A cut-away model was introduced in evidence. It appears to contain some fourteen parts. The patent rights to the Hill Jar were obtained by Well Control when it acquired the J. Ed Hill Company in 1969, but the patent expired in 1975. The patents tell how it works, not how to make it. Over the years Well Control changed the design of the jars to "restrict the tolerance a great deal or (sic) the springs and changed the packing, method and the barrel." A sales brochure containing extensive specifications and dimensions of Bat-Jac was admitted in evidence. We note that it is identical with Well Control's brochure except that it uses the names "Bat-Jac" and "Battering Ram" instead of "Well Control" and "Hill Jar." Kimmel commented that even an erroneous figure has been copied.

Plaintiffs' Exhibit No. 6, a sepia drawing of the mandrel (interior, working parts) of the Hill Jar, was introduced during Kimmel's testimony. A sepia is a drawing made from the original drawing and can be changed and then used to make blueprints or copies. One of George Clark's duties was to do the drafting and drawing of the Hill Jar. If he was to make another size draw-

ing or another size mandrel, he would take the original copy and make a reproducible or a sepia, turn the drawing over to the back side, erase the parts he wanted to change, turn it back over and make the changes and then he would have a new drawing. It was Kimmel's opinion that if a draftsman was furnished the complete details and had to start without prior drawings; it would take him at least thirty to sixty days to reproduce the necessary twenty or so drawings.

In an effort to keep these drawings confidential Thermotics placed this priority stamp or plate on drawings:

"The information disclosed herein is proprietary with Thermotics Inc. and shall not be duplicated, used or disclosed to reproduce articles or subject matter covered therein without written permission of Thermotics Inc."

It is company policy to have this stamp put on all drawings. George Clark was principally in charge of drawings and of putting the stamp on them.

It was the practice of Thermotics and Well Control to try to get all employees in management and technical positions to sign a confidential disclosure document. Kimmel believes Batson told him that he had executed a confidential agreement. He does not have a copy of it, but he does have copies of those executed by Clark and Samford. They contain no covenants that the employees would not enter into a competing business but include an agreement that the employees would not disclose any trade secrets or other confidential information during and after employment.

L. L. Machine Shop has made over a quarter of a million dollars worth of the jars for Well Control in the last 15 years. L. L. Byrne runs the shop and makes the jars from drawings given him by Well Control, but Kimmel is sure Byrne knows how to make them without reference to the drawings. Byrne does all the machining but obtains springs, packings, and seals for the jar from three companies that Well Control works with. Byrne originally told Kimmel that he was not going to build any

jars for Bat-Jac until all legal problems had been cleared up. He later admitted having lied about it and having built some, but he said Bat-Jac would not get them until the legal problem had been cleared up. Byrne told Kimmel that the Bat-Jac drawings contained the same mistakes as Well Control's drawings. Those who assemble the jars must have expertise to do it. It takes between 30 and 120 days to get the material, have it machined, get the component parts, and have the jars heat treated.

Kimmel admitted on cross-examination that there is more than one maker of drilling jars and that there are eight to ten different rotary drilling jars. He later said the Hill Jar is unique in that it works. The metal is unique in the way it is heat treated, but anyone who could conduct a metal test could determine what metals were used and the manner it was formed. He also admitted that each part could be copied if one could disassemble the jar, that it could be copied by anyone with sufficient technical knowledge, and that any machine shop could duplicate it by trial and error, but it would take time. Some of the drawings in the possession of L. L. Machine Works had confidential stamps on them but they probably had some Hill drawings without stamps from before he acquired J. Ed Hill Company. There is no written agreement with Byrne or anyone connected with L. L. Machine Works.

Kimmel stated on re-direct examination that Well Control had projected earnings of $496,000 for 1976 but as a result of the incidents made the basis of this litigation he revised and projected Well Control to lose approximately $100,000. The Hill Jar produces Well Control's best profit.

Defendant Albert L. Batson was called as an adverse witness by the plaintiffs. He is the president of Bat-Jac, and he, Samford, and George Clark are its principal shareholders. He admitted knowing that the Battering Ram is in direct competition with the Hill Jar and admitted that it is exactly like the Hill Jar. There are copies of Hill Jar drawings all over the country. He did not personally copy any drawings, but said

they were copied on some copy machine in Houston. He told Clark to get them but did not know where they got the drawings. He later admitted that he, Clark, and Samford did not intend to look at a part and manufacture their own set of drawings. They copied Thermotic's drawings and went directly to L. L. Machine, the shop that made the jars for Thermotics. They asked L. L. Machine to make the jar because Byrne was a friend and they knew he could do the work. Someone from Bat-Jac went to Leeco, the company that manufactures springs for Well Control's jar, and asked them to make some springs for the Battering Ram. He went to a company that made molds for Thermotics and asked them if he could use them, but the company refused. He had the advertising brochure for the Battering Ram made by the same company that printed the one for Well Control. It is exactly the same as theirs except for the names of the products and the companies.

Batson didn't sign a confidential agreement or patent assignment agreement with Thermotics or Well Control. Bat-Jac has seven or eight outstanding quotes on jars, including one to a former customer of Well Control. Twenty jars are being made for Bat-Jac by Byrne; none have been sold, but two have been rented to a former customer of Well Control. The reason Well Control's business went down was because a severe drop in drilling cut off sales of the degasser and because there was an increase in competition. He, Samford, Clark, and Byrne all had knowledge of drilling jars before going to work for Well Control. George Clark could draw a set of prints from memory, could get the components, and produce a jar in thirty days.

Defendant George M. Clark testified that he signed an employee agreement. He xeroxed the drawings of Well Control when he left the company. He made no effort on his own to reconstruct the drawings but merely copied a drawing of a xerox copy. The drawing he xeroxed was not a Thermotic's drawing but a J. Ed Hill drawing, and the only changes were that he placed Bat-Jac instead of Hill or Well Control on it, changed the drawing number, the date, and "any other changes it needed." When asked why he made copies of the drawing he replied: "We were not building the exact tool . . ." He admitted using Well Control's drawings.

L. L. Byrne owns the L. L. Machine Works. He denied using the Well Control drawings Kimmel gave him to make the jars for Bat-Jac. George Clark gave him the drawings. He has an inventory of jars for Well Control. Some have been around for eight or nine years and Well Control didn't take them and didn't want them. When asked whether the jars he built for Well Control and those he is building for Bat-Jac are the same, he answered, "Yes, sir, they are similar, like on patents." He admitted that Mr. Kimmel could use in his business the jars made for Bat-Jac.

Q. "All you have to do is change Bat-Jac to Well Control?"

A. "Yes, that would be pretty close."

Frank Clark, a machinist, was the only witness called by the appellees. He has made rotary drilling jars in the past, and if furnished a set of plans for the Hill jar he could make it in thirty days; if he was fully staffed and not busy, he could do it in two weeks.

■ Where no findings of fact or conclusions of law were made by the trial court, we must consider the facts in the light most favorable to support the order of that court. *International Union of Operating Engineers v. Cox*, 148 Tex. 42, 219 S.W.2d 787 (1949).

■ Ordinarily, the trial court has broad discretion in determining whether or not to issue a temporary injunction, and its judgment will not be overturned unless the record discloses a clear abuse of discretion. The general rule is not unlimited; it does not extend to the erroneous application of the law to undisputed facts. *City of Spring Valley v. Southwestern Bell Telephone Co.*, 484 S.W.2d 579 (Tex.1972).

■ Even though it be uncontradicted, testimony of an interested witness, such as Mr. Kimmel in our case, cannot be considered as doing more than raising an issue

of fact unless it is clear, direct and positive and there are no circumstances in evidence tending to discredit or impeach it. This exception is especially true where the opposite party has the means and opportunity of disproving the testimony, if it is not true, and fails to do so. *Great American Reserve Insurance Co. v. San Antonio Plumbing Supply Co.,* 391 S.W.2d 41 (Tex.1965).

■ It is well settled that injunctive relief may be granted when one breaches his confidential relationship in order to unfairly use a trade secret. In the area of confidential relationships such as between employers and employees the injured party is not required to rely upon an express agreement to hold the trade secret in confidence. *Hyde Corporation v. Huffines,* 158 Tex. 566, 314 S.W.2d 763 (1958).

The question of whether the appellant's improvements to the Hill Jar were trade secrets is a crucial one in this case. The definition generally accepted is contained in 4 Restatement of Torts, § 757:

"b. Definition of trade secret. A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. * * * A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article."

■ To be a trade secret, the subject matter must be secret. In *Wissman v. Boucher,* 150 Tex. 326, 240 S.W.2d 278, our Supreme Court held that there was no trade secret involved in production of a metallic fishing rod that would collapse into one piece and thus also serve as a walking stick. In *K & G Oil Tool & Service Co. v. G & G Fishing Tool Service,* 158 Tex. 594, 314 S.W.2d 782 (1958), the court held that the

magnetic fishing tool there involved could not properly be placed in the same category with the collapsible fishing rod insofar as ease of production was concerned. The fishing rod in *Wissman v. Boucher* was described as a simple and obvious device, the construction of which was ascertainable at a glance, while magnetic fishing tools had been the subject of many patents, and much work and ingenuity had been applied to the development of the K & G tool.

In our case it seems clear from an examination of the model that the improved Hill Jar is relatively complex and fits in the same category as the magnetic fishing tool rather than in the collapsible fishing rod one.

In *Luccous v. J. C. Kinley Company,* 376 S.W.2d 336 (Tex.1964), the subject matter of a trade secret which an inventor sought to protect was the same as that protected by an expired patent. Our Supreme Court held that an inventor may elect to obtain a patent and thus protect his invention for a limited time on condition that he make full disclosure for the benefit of the public of the manner of making and using the invention, or he may refrain from making a public disclosure and protect his trade secret under the equitable jurisdiction of the state courts. When the patent is granted the entire patent file and its contents become public property, and the equitable powers of the court are not available to protect the trade secret after the patent expires.

The case under submission is distinguishable from *Luccous* on its facts. Our Supreme Court cited with approval in *Hyde Corporation v. Huffines,* 314 S.W.2d 763 at p. 778 (1958) a holding in *Franke v. Wiltschek,* 209 F.2d 493 (2d Cir.) that the plaintiffs were entitled to protection of a trade secret characterized by the defendant as one whose heart "was revealed by an expired patent, and that the improvements thereon were unpatentable applications of mechanical skill." The court said:

" . . . This totally misconceives the nature of plaintiffs' right. Plaintiffs do not assert, indeed cannot assert, a proper-

ty right in their development such as would entitle them to exclusive enjoyment against the world. Theirs is not a patent, but a trade secret. The essence of their action is not infringement, but breach of faith. It matters not that defendants could have gained their knowledge from a study of the expired patent and plaintiffs' publicly marketed product. The fact is that they did not. Instead they gained it from plaintiffs via their confidential relationship, and in so doing incurred a duty not to use it to plaintiffs' detriment. This duty they have breached. . . ."

See also *Welex Jet Services v. Owen,* 325 S.W.2d 856 (Tex.Civ.App.1959, writ ref. n.r.e.) and the discussion of that case in *Luccous v. J. C. Kinley Co.,* supra, at p. 339.

■ As to the appellants' first point of error, we conclude that the evidence established as a matter of law only that the improvements made by the appellants to the Hill Jar (after it was patented) were trade secrets entitled to protection by temporary injunction. We do not agree with the appellants that the record shows they were entitled to protection of the "process by which the Hill Jar and/or other products of appellants were developed, engineered, refined, fabricated, manufactured, marketed and all the confidential data associated therewith . . ." We sustain the appellants' other six points of error.

We hold that these facts were established as a matter of law:

1. Thermotics and Well Control bought the patent rights to the Hill Jar.

2. Those patent rights expired in 1975.

3. Thermotics and Well Control improved the performance of the Hill Jar by changing the design to restrict tolerances and by changing the length of the springs, the packing method, and the barrel.

4. These improvements constituted trade secrets.

5. Defendants Batson, Clark, and Samford organized defendant Bat-Jack Tool Company while still employed by the appellants.

6. Drawings of the Hill Jar were obtained by defendant Clark from the plaintiffs without their knowledge or consent while he was employed by them.

7. Through use of these drawings and know-how of defendants Clark, Batson and Byrne, acquired during the existence of their confidential relationships with the plaintiffs, they duplicated the improved Hill Jar.

8. Although defendant L. L. Machine Works had been making Hill Jars for the appellants for several years it was these drawings it used to produce the Battering Ram, a drilling tool that is a duplicate of the Hill Jar.

9. The defendants could have duplicated the improved Hill Jar by using any one of several other methods that would not have entailed the unauthorized use of trade secrets, but they didn't.

The evidence introduced at the hearing on the application for a permanent injunction may well differ from that here reviewed.

It has not been established that defendant Mrs. Gekas breached her confidential relationship in order to unfairly use a trade secret belonging to the appellants. As to the other defendants, we hold that the trial court abused its discretion in denying the plaintiffs' application for temporary injunction. We reverse the order of the trial court and remand this cause to the trial court with instructions to grant the temporary injunction in keeping with this opinion upon the execution by the appellants of an injunction bond in an amount to be set by the trial court.