Eliseo **VALENZUELA, Jr.**
et al., Petitioners,

v.

Eduardo **AQUINO et al., Respondents.**

No. D–0740.

Supreme Court of Texas.

May 5, 1993.

Clifford L. Zarsky, Corpus Christi, William Charles Bundren, Dallas, for petitioners.

Frank E. Weathered, Corpus Christi, for respondents.

## OPINION

HECHT, Justice.

Dr. Eduardo Aquino and his family ("Aquino") sued Eliseo Valenzuela, Jr., and others ("Valenzuela") for damages resulting from picketing near the Aquino home and for an injunction against continued picketing. Aquino based his action on two theories, negligent infliction of emotional distress and breach of privacy, but at trial before a jury Aquino obtained jury findings on only the first theory. The trial court rendered judgment on the verdict, awarding Aquino damages against Valenzuela and permanently enjoining Valenzuela from picketing within 400 feet of the Aquino home. The court of appeals reversed the award of damages but affirmed the injunction. 800 S.W.2d 301. We granted both Aquino's and Valenzuela's petitions for writ of error.

■■■■ No action for negligent infliction of emotional distress exists in Texas. *Boyles v. Kerr*, 855 S.W.2d 593 (Tex.1993). The trial court's judgment cannot therefore be sustained on this theory. Aquino's breach of privacy claim appears to be based upon our decision in *Billings v. Atkinson*, 489 S.W.2d 858 (Tex.1973), in which we recognized a cause of action for a willful, unwarranted invasion of privacy, relying in part upon RESTATEMENT OF TORTS § 867 (1939). A successor provision, RESTATEMENT (SECOND) OF TORTS § 652B (1977), now states:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Thus defined, there are two elements to this cause of action: (1) an intentional intrusion, physically or otherwise, upon another's solitude, seclusion, or private affairs or concerns, which (2) would be highly offensive to a reasonable person. Aquino did not request that either of these elements be submitted to the jury, and the evidence did not establish either element beyond dispute. At trial Valenzuela argued that the picketing, although certainly directed at Aquino, was not an intentional intrusion upon his privacy, and was not of a nature highly offensive to a reasonable person. Without a resolution of this factual dispute, the trial court could not grant Aquino relief on his second theory.[1] Thus, the trial court's judgment cannot be based on either of the theories pleaded by Aquino.

JUSTICE SPECTOR's dissenting opinion argues that the jury finding that picketing was focused or directed at the Aquino residence satisfies both elements of a cause of action for breach of privacy. In fact, it satisfies neither. Were it otherwise, picketing focused at a residence would always be an actionable breach of privacy, regardless of the circumstances, or of whether the target was an employer, an alleged polluter, a general, a public official, or a physician. Even if the picketers in this case were beyond the 400-foot limit imposed by the trial court, the picketing would still be focused on the Aquino residence. There may be limits on focused

---

1. The dissent cites testimony by two picketers. Eliseo Valenzuela, Jr. did testify that his purpose was to "intimidate" Dr. Aquino, but a little later he testified that by "intimidation" he meant "to express our views and to let other people know about it", to "persuade, not forcefully", "to affect the conscience" of the Aquinos, and "to prick the conscience" of others in the neighborhood. Charles W. Bolton, a truck driver by occupation, answered "yes" when asked whether he considered his conduct to be an invasion of the Aquinos privacy, but later testified that he had not understood the question, and that he had picketed "just ... to let the neighbors know" that Dr. Aquino did abortions. The testimony of both these witnesses is far from unequivocal. Even assuming that their testimony was attributable to all the picketers, so as to establish the first element of an action for invasion of privacy, it does not establish the second element.

residential picketing, *see, e.g., Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), but it is not unlawful per se.[2]

The dissenting opinions explore the limits on such picketing and urge the Court to do likewise. Absent findings or evidence to establish Valenzuela's liability to Aquino, we decline to debate the very important and difficult but nevertheless hypothetical issue of whether Valenzuela's constitutional rights might provide a shield from such liability if it were ever established.

In *Boyles* we concluded that because the plaintiff may have believed it unnecessary to assert claims alternative to negligent infliction of emotional distress in reliance on our opinion in *St. Elizabeth Hospital v. Garrard*, 730 S.W.2d 649 (Tex.1987), the case should be remanded for a new trial in the interest of justice. Consistently, the present case must also be remanded.

Accordingly, the judgment of the court of appeals is affirmed insofar as it sets aside the trial court's award of damages, and reversed in all other respects, and the case remanded to the trial court for a new trial.

Justice DOGGETT concurs in the judgment only.

Dissenting Opinion by Justice GONZALEZ.

Dissenting Opinion by Justice GAMMAGE.

Dissenting Opinion by Justice SPECTOR.

GONZALEZ, Justice, dissenting.

This case squarely presents the issue of whether an otherwise lawful picketing operation may be directed toward a private home. When a residence is used exclusively for residential purposes, I would hold that the persons living in that home have a right to enjoy the home without intrusion of their privacy by the sights and sounds that they might have to endure at the office. Under the facts of this case, I would hold that as a matter of law, the Aquinos showed invasion of privacy with evidence that petitioners intentionally intruded into respondents' solitude in a manner that is highly offensive to a reasonable person. In short, under this record, the state has a compelling interest in protecting the common law right of privacy of an individual,[1] and can therefore place reasonable restrictions on the picketers' constitutional right of free expression. The injunction at issue was sufficient to accomplish this end. I would thus affirm the judgment of the court of appeals.

## I.

Dr. Eduardo Aquino is an obstetrician and gynecologist in Corpus Christi, Texas. Part of his practice includes performing abortions. Mercedes Aquino, Dr. Aquino's wife, is the office manager of his practice.

Since 1982, petitioners have picketed the two clinics where Dr. Aquino performs abortions. In March 1988, the petitioners began to also picket his residence which faces a cul-de-sac. On four consecutive Tuesdays, between 4:30–6:00 p.m., a group of picketers (the size of the group varied from 11 to 25), walked up and down the sidewalk and street where Dr. Aquino's residence stands. The picketers walked in front of the Aquinos' residence, two houses over and two houses back carrying signs which, among other things, read "Abortion is Murder" and "God Gives Life, Aquino Takes Away." The picketers did not block

---

**2.** JUSTICE SPECTOR's opinion also argues that a permanent injunction can issue without a finding of legal liability "so long as the evidence and jury findings establish the likelihood of future violations", citing *State v. Texas Pet Foods*, 591 S.W.2d 800 (Tex.1979). In that case the jury found hundreds of violations, and the trial court enjoined the conduct found by the jury and certain other conduct as well. The issue in that case was not whether an injunction could issue without a finding of liability on some legal theory, but whether future conduct could be enjoined based upon the occurrence of past conduct. No final relief, including a permanent injunction, can be granted in a contested case without a determination of legal liability, and the dissenting opinion cites no authority to the contrary.

**1.** *See Billings v. Atkinson*, 489 S.W.2d 858 (Tex. 1973).

the driveway or interfere with access to the property. Law enforcement officers who observed the activity testified that the picketers breached no state law or city ordinance. Nonetheless, as one can imagine, the effect the picketers had on the family was devastating. It severely disrupted the tranquility of the home and some of the family members became ill.

After the fourth protest, Dr. and Mrs. Aquino, individually and on behalf of their minor children, filed suit against nine individuals and a pro-life organization seeking injunctive relief and damages for negligent infliction of emotional distress that the picketing allegedly caused them and their family. They obtained a temporary restraining order denying the petitioners the right to picket closer than one-half mile from the Aquinos' house. The court of appeals invalidated this order as overly broad. *Valenzuela v. Aquino*, 763 S.W.2d 43 (Tex.App.—Corpus Christi 1989, no writ).

The Aquinos subsequently proceeded to trial on their suit for a permanent injunction and damages. After a jury trial, the case was submitted to the jury on the theories of negligent and grossly negligent infliction of mental distress. The jury answered the questions favorably for the Aquinos and also found that the picketing was focused or directed upon the Aquino residence. In conformity with the jury verdict, the trial court rendered an $810,000 judgment against the petitioners as well as a permanent injunction which prohibited the petitioners from engaging in any type of picketing within 400 feet of the centerline of Dr. Aquino's property.

The petitioners perfected an appeal to the court of appeals asserting that the judgment infringed upon their rights of freedom of speech under both the federal and Texas constitutions. The court of appeals reversed the damage award but affirmed the injunction. I would affirm the judgment of the court of appeals.

## II.

The petitioners assert that the permanent injunction is invalid under both the United States and the Texas Constitutions' guarantees of freedom of speech. In *Davenport v. Garcia*, 834 S.W.2d 4 (Tex.1992), we held that article I, section 8 of the Texas Constitution provides greater rights of free expression than its federal equivalent, and that we could benefit from the insights of well-reasoned and developed federal and state jurisprudence concerning corresponding constitutional guarantees.

The First Amendment to the United States Constitution provides, among other things, that "Congress shall make no law ... abridging the freedom of speech." U.S. CONST. amend. I. In 1925, the Supreme Court decided that the First Amendment applied to all state action through the Fourteenth Amendment, thus prohibiting any governmental body, including the courts, from unwarrantedly restricting a citizen's speech. *See Gitlow v. New York*, 268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138 (1925). The Supreme Court subsequently recognized that the First Amendment's speech clause protects certain expressive conduct, such as burning the United States flag at a political convention, wearing black arm-bands to protest a war, conducting a silent sit-in against segregationist policies, picketing a supermarket's unfair labor practices, and flying a red flag as a political statement. *See, e.g., Texas v. Johnson*, 491 U.S. 397, 404–05, 109 S.Ct. 2533, 2539–40, 105 L.Ed.2d 342 (1989); *Tinker v. Des Moines Ind. Community Schools*, 393 U.S. 503, 505, 89 S.Ct. 733, 735, 21 L.Ed.2d 731 (1968); *Amalgamated Food Employees Union Local 509 v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 313–14, 88 S.Ct. 1601, 1605–06, 20 L.Ed.2d 603 (1968); *Brown v. Louisiana*, 383 U.S. 131, 141–42, 86 S.Ct. 719, 723–24, 15 L.Ed.2d 637 (1966); *Stromberg v. California*, 283 U.S. 359, 369–70, 51 S.Ct. 532, 535–36, 75 L.Ed. 1117 (1931). Although governmental authorities may regulate expressive conduct more easily than the written or spoken word, such conduct nevertheless will obtain First Amendment protection if the government prohibits it "precisely because of its communicative attributes." *See Barnes v. Glen Theatre, Inc.*, — U.S. ——, ——, 111

S.Ct. 2456, 2461, 115 L.Ed.2d 504, 518 (1991); *see also Johnson,* 491 U.S. at 404–05, 109 S.Ct. at 2539–40; *Young v. New York Transit Auth.,* 903 F.2d 146, 154 (2d Cir.1990), *cert. denied,* 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990) (panhandling in subway not expressive conduct deserving First Amendment protection).

Peaceful picketing is one type of expressive conduct that usually merits First Amendment protection. *See, e.g., Boos v. Barry,* 485 U.S. 312, 318, 108 S.Ct. 1157, 1162, 99 L.Ed.2d 333 (1988) (struck down ordinance restricting embassy picketing because content based); *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983); *Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980); *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940) (first recognized picketing as protected "speech"); *but see Frisby v. Schultz,* 487 U.S. 474, 484, 108 S.Ct. 2495, 2502, 101 L.Ed.2d 420 (1988) (restricted residential picketing).

The United States Supreme Court held in *Carey v. Brown* that peaceful picketing in a residential area is protected speech. *Carey* involved an Illinois statute that prohibited all picketing of residences or dwellings except for picketing of a place of employment as part of a labor dispute. In *Carey,* the Court did acknowledge the tension that exists between freedom of speech, and the states' interest in preserving the sanctity of the home, noting "that the one retreat to which men and women can repair to escape from the tribulation of their daily pursuits is surely an important value." 447 U.S. at 460, 100 S.Ct. at 2290. Nonetheless, the Court invalidated the statute. The Court specifically stated that the First Amendment protects picketing on the public streets and sidewalks of residential neighborhoods from unjustified state interference. *Carey,* 447 U.S. at 460, 100 S.Ct. at 2290. *See also Gregory v. Chicago,* 394 U.S. 111, 113, 89 S.Ct. 946, 947, 22 L.Ed.2d 134 (1969) (reversing conviction for disorderly conduct that stemmed from picketing of mayor's house); *Flores v. City of Denver,* 122 Colo. 71, 220 P.2d 373, 376 (1950) (reversing conviction for picketing in front

of governor's house); *State v. Anonymous,* 6 Conn.Cir. 372, 274 A.2d 897 (1970) (reversing conviction for residential picketing); *State v. Schuller,* 280 Md. 305, 372 A.2d 1076, 1082 (1977). *Cf. Garcia v. Gray,* 507 F.2d 539 (10th Cir.1974) (upheld ordinance banning residential picketing except if related to labor dispute as valid exercise of police powers); *Degregory v. Giesing,* 427 F.Supp. 910, 913 (D.Conn. 1977) (legislature properly regulated labor picketing in residential areas but "[o]ther considerations might apply to other types of picketing approaching more closely to pure speech"); *Hall v. Hawaiian Pineapple Co.,* 72 F.Supp. 533, 537 (D.Haw.1947) (residential picketing ban valid exercise of police powers).

## III.

Peaceful picketing is generally considered protected speech; it nevertheless sometimes may be regulated. The validity of such regulation generally depends on the nature of the public forum within which the activity occurs. *See, e.g., Greer v. Spock,* 424 U.S. 828, 836, 96 S.Ct. 1211, 1216, 47 L.Ed.2d 505 (1976) (upheld prohibition of picketing on military installation); *Adderley v. Florida,* 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966) (picketing prohibited on jailhouse grounds).

The Supreme Court has developed three categories to analyze expressive conduct in varying public forums, namely: 1) the traditional public forum; 2) the quasi-public forum; and 3) the non-public forum. *See, e.g., International Soc. for Krishna Consciousness, Inc. v. Lee,* —— U.S. ——, ——, 112 S.Ct. 2701, 2706, 120 L.Ed.2d 541, 550 (1992); *Perry Educ. Ass'n v. Perry Local Educators Ass'n,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983) (establishing tri-partite method of public forum analysis). Traditional public forums include those places historically devoted to assembly and debate; quasi-public forums consist of places the state has designated for open public discourse. *Compare Grace,* 461 U.S. at 177, 103 S.Ct. at 1706 (streets and public sidewalks are traditional public forums) *with Widmar v. Vincent,*

454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (state university meeting facilities are designated public forums). A state may regulate expressive conduct occurring in either of these forums if the state demonstrates a compelling interest or implements a valid time, place, and manner restriction. *See Ward v. Rock Against Racism,* 491 U.S. 781, 790–91, 109 S.Ct. 2746, 2753–54, 105 L.Ed.2d 661 (1989) (time-place-manner restriction must be content neutral, narrowly tailored to serve significant state interest, and leave open alternative communication channels). The third category involves non-public forums, such as municipal buses or military bases, within which the state may regulate expressive conduct if the regulation is rationally based and content neutral. *See, e.g., United States v. Kokinda,* 497 U.S. 720, 730, 110 S.Ct. 3115, 3121, 111 L.Ed.2d 571 (1990) (upheld regulation of expressive conduct on post office sidewalk because sidewalk was non-public forum for solicitation of funds); *Greer,* 424 U.S. at 836, 96 S.Ct. at 1216; *Lehman v. City of Shaker Heights,* 418 U.S. 298, 303, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974) (upheld municipal ordinance banning political advertising on city buses). The forum at issue in this case is a public sidewalk in a residential neighborhood; a traditional public forum. Thus, the state may implement reasonable time, place, and manner restrictions on conduct occurring in this forum.

*Frisby v. Schultz* presented the United States Supreme Court with an issue quite similar to the one that now faces this Court, namely, whether abortion opponents have the constitutional right to picket a doctor's residence. The protests in *Frisby* occurred on six separate occasions in 1985 in Brookfield, Wisconsin. Police who observed the Brookfield protestors noted that the protestors did not violate any state laws or municipal ordinances, and no arrests were made. The town council, not the affected doctor, acted to curtail the protests, and it did so by passing an ordinance, rather than securing an injunction, that banned all picketing "before or about" any residence in Brookfield.[2] *See Frisby,* 487 U.S. at 476, 108 S.Ct. at 2498. The United States Supreme Court upheld the Brookfield ordinance as a valid time, place, and manner restriction by narrowly construing it to prohibit only "the evil of targeted residential picketing." *Id.* at 488, 108 S.Ct. at 2504.

In its "time, place and manner" analysis, the Court briefly dispensed with three of the four operative factors by accepting the lower court's conclusion that the ordinance was content neutral, relying on Brookfield's oral argument to hold that it was narrowly tailored, and agreeing with Brookfield's assertion that ample alternative communication channels self-evidently existed. The Court devoted most of its inquiry to the fourth factor, namely, that the ordinance furthered a significant government interest "in protecting the well-being, tranquility, and privacy of the home." *Id.* at 484, 108 S.Ct. at 2502 (quoting *Carey,* 447 U.S. at 471, 100 S.Ct. at 2295). The right of persons to privacy in their own homes includes the right to be free from undue intrusions. *See, e.g., Ward,* 491 U.S. at 796, 109 S.Ct. at 2756 (city may protect residents from offensive noise intruding into home); *FCC v. Pacifica Foundation,* 438 U.S. 726, 748–49, 98 S.Ct. 3026, 3039–40, 57 L.Ed.2d 1073 (1978) (offensive radio broadcast intruded on privacy of home); *Rowan v. Post Office Dep't,* 397 U.S. 728, 738, 90 S.Ct. 1484, 1491, 25 L.Ed.2d 736 (1970) (restricted offensive mailings); *Kovacs v. Cooper,* 336 U.S. 77, 86–87, 69 S.Ct. 448, 453, 93 L.Ed. 513 (1949) (restricted sound amplification in residential neighborhood); *see also United States v. Lee,* 935 F.2d 952, 956–57 (8th Cir.1991) (burning cross 400 feet from apartment complex not protected by First Amendment because intimidating intrusion).

---

2. The ordinance read:
    It is unlawful for any person to engage in picketing before or about the residence or dwelling of any individual in the Town of Brookfield.

*Schultz v. Frisby,* 807 F.2d 1339, 1342 (7th Cir. 1986).

Other state courts have reached just such a conclusion in contexts quite similar to the case before us. In *Boffard v. Barnes,* 248 N.J.Super. 501, 591 A.2d 699 (Ch.Div.1991), a New Jersey court relied exclusively on First Amendment forum analysis to hold that an injunction prohibiting picketing within 200 feet of the doctor's house was a valid time, place, and manner restriction. The court's decision depended on what it called "the balance to be struck between the defendant's right of free speech and the plaintiffs' right to privacy." *Id.* at 701. The court concluded that the "disruptive potential inherent in the conduct" of residential picketing offsets any injury to the protestor's right of free expression. *Id.*

In *Klebanoff v. McMonagle,* 380 Pa.Super. 545, 552 A.2d 677 (1989), a Pennsylvania superior court relied on the United States and Pennsylvania constitutions to uphold a permanent injunction against picketing directly in front of a doctor's house. *Id.* at 682. The court's analysis of the constitutional issues, however, focused exclusively on the First Amendment, and thus the court employed a standard time, place, and manner test to scrutinize the injunction. The court relied on *Frisby* to validate this injunction; its language parroted the "focused picketing" restriction of which *Frisby* approved. *Id.* at 678. In *Northeast Women's Center, Inc. v. McMonagle,* 939 F.2d 57, 66–67 (3rd Cir.1991), anti-abortion activists engaged in physical attacks on patients and doctors at an abortion clinic. They were found guilty of civil Rico, and state torts of trespass and intentional interference with contract. An injunction was entered prohibiting the activists from approaching more than 2500′ of the residence of any of the employees of the abortion clinic. The injunction was promptly disobeyed and one of the individuals incarcerated. The court of appeals left the 2500′ limitation in place for sound equipment and bullhorns, and modified the injunction's limitation of picketing to 500′ in an attempt to reconcile the inherent conflict between the privacy interests of the residents and the freedom of expression of the protestors.

As is readily evident, courts have struggled with the issue of reconciling the privacy interests of a homeowner and the First Amendment guarantee of freedom of expression. A significant government interest exists in protecting the privacy of residents and the right of privacy must be placed on the scales with the right of free expression in a public forum. This is a close call and in my opinion, under the facts of this case, the scales are tilted in favor of privacy. I thus conclude that this injunction is sufficiently narrowly tailored to serve the interest of protecting the privacy of the Aquinos. The evils caused by the picketers cannot be eliminated without the injunction. Justice Rehnquist eloquently articulated the state's interest in guaranteeing its citizens' privacy in his dissent in *Carey v. Brown,* 447 U.S. 455, 478, 100 S.Ct. 2286, 2299 where he observed that "there are few of us that would feel comfortable knowing that a stranger lurks outside our home." He quotes from *Wauwatosa v. King,* 49 Wis.2d 398, 411–12, 182 N.W.2d 530, 537 (1971):

> To those inside ... the home becomes something less than a home when and while the picketing ... continue[s].... [The] tensions and pressures may be psychological, not physical, but they are not, for that reason, less inimical to family privacy and truly domestic tranquility.

447 U.S. at 478, 100 S.Ct. at 2299.

### IV.

Article I, section 8 of the Texas Constitution says that:

> Every person shall be at liberty to speak, write or publish opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or the press.

**Tex. Const.** art. I, sec. 8. It differs from the federal constitution's speech clause in its more expansive language. *See Davenport v. Garcia,* 834 S.W.2d at 10; *see also Casso v. Brand,* 776 S.W.2d 551, 564 (Tex. 1989) (Gonzalez, J., concurring and dissenting); *KGBT v. Briggs,* 759 S.W.2d 939, 944 (Tex.1988) (Gonzalez, J., concurring) (article

I, section 8 more expansive than federal right); *O'Quinn v. State Bar of Texas*, 763 S.W.2d 397, 403 (Tex.1988). Contrary to section eight's affirmative grant, the First Amendment casts its freedom of speech clause negatively. As broad as the Texas guarantee of freedom of speech is, it is not absolute, but must yield to other compelling state interests, such as the right to be let alone in one's home where no business in the traditional sense is transacted.

In *Davenport v. Garcia*, 834 S.W.2d 4 (Tex.1992), we applied the guarantees of free expression of article I, section 8 of the Texas Constitution to determine the validity of prior restraints in the form of a trial court gag order. We set forth a two-prong test with regard to gag orders, requiring evidence of an imminent and irreparable harm to the judicial process which would deprive the litigants of a just resolution of their dispute, and the judicial restriction would be the least restrictive means to prevent that harm. *Davenport*, 834 S.W.2d at 10.

Assuming for the sake of argument that the injunction in question could be considered a prior restraint, the harm to the Aquino's peace and tranquility was imminent and irreparable, for which an injunction would be the only meaningful remedy. In the context of the facts of this case, the injunction represents as narrowly tailored a remedy as possible in balancing the right of privacy and the right of speech. There was no limitation on the protestors' right to communicate to the doctor and his wife at the clinic. There are no limitations on place, provided the communications do not constitute picketing activity. The distance requirement is reasonably necessary to insure the Aquino's privacy. Thus even assuming the injunction could be classified as prior restraint, I would uphold it under the Texas Constitution.

## V.

I disagree with Justice Gammage's conclusion that the damages award should stand. The court of appeals reversed the award, holding that damages for expressive speech are prohibited under constitutional guarantees of free speech. 800 S.W.2d 301, 309. I agree with the court of appeals. *See also Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988).[3] The uncertainty of not knowing where one might be penalized for expressive speech would have an unacceptable chilling effect on the right of free speech. Such concerns are not present, however, once an injunction is in place. Defendants may be held accountable for damages should they violate such an injunction in the future which results in injury.

GAMMAGE, Justice, dissenting.

I join in Justice Spector's dissent, but write separately because I differ with her opinion in regard to the Aquinos' right to damages. I would recognize the Aquinos' right to recover for the outrageous conduct directed toward them.

Justice Spector notes, as did the court of appeals, that the demonstrators are a group who zealously voice their views. 800 S.W.2d at 303. At trial, the demonstrators asserted their objective in picketing the Aquino home was to *intimidate* Dr. Aquino. The demonstrators picketed Dr. Aquinos' home only at times when they knew he personally would not be there. The timing of their picketing was directed to another purpose they stated—to disrupt the Aquinos' family life.

### DAMAGES

Article I, § 8 of the Texas Constitution provides that "[e]very person shall be at liberty to speak, write or publish his opinions on any subject, *being responsible for the abuse of that privilege....*" TEX.

---

**3.** Permitting damages for expressive speech has a stifling effect on the free speech guarantees. Thus, the Court held in *Falwell* that granting Falwell damages for intentional infliction of emotional distress would violate the prohibition on damage awards where the speech in question may have an adverse emotional impact on the audience. *Falwell*, 485 U.S. at 55, 108 S.Ct. at 881.

CONST. art. I, § 8 (emphasis added). This provision does not permit recovery of damages for protected speech. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). But if damages arise from independent conduct unrelated to protected speech, recovery may be allowed. *See United States v. O'Brien*, 391 U.S. 367, 381–82, 88 S.Ct. 1673, 1681–82, 20 L.Ed.2d 672 (1968) (affirming defendant's criminal conviction for burning draft card because he was convicted for the "noncommunicative impact" of his conduct); *James v. Brown*, 637 S.W.2d 914, 917 (Tex.1982) (recognizing that unavailability of defamation action did not preclude separate and independent negligence claim).

In other words, liability under Article I, § 8 may arise only where the conduct is so excessive and intrusive that it does not deserve constitutional protection. *See Casso v. Brand*, 776 S.W.2d 551, 556 (Tex. 1989) (regarding ability to bring defamation action when speech loses protection under art. I, § 8). Where unprotected conduct is intertwined with protected expression and a claim for damages arises from the unprotected conduct, liability may arise. *See James v. Brown*, 637 S.W.2d at 917. Much of the demonstrators' conduct cannot be considered integral to their ability to deliver their message. Indeed, the record reveals that some of their conduct[1] involved not just "mere advocacy, but ... [also included] ... overt act[s] of intimidation" unrelated to protected expression. *See United States v. Lee*, 935 F.2d 952, 956 (8th Cir.1991). The presence of such conduct tends heavily to support the jury's finding that the demonstrators caused the Aquinos mental anguish. To award damages as a consequence of unprotected collateral conduct does not chill free expression, and recovery should be allowed in this case.

When the exercise of their free speech rights to picket Dr. Aquino's clinic did not achieve their objective, petitioners went beyond protected expression. They intentionally engaged in conduct calculated to intimidate and harm Dr. Aquino and his family through outrageous actions at his private residence. What they could not win through the persuasion of protected free speech they sought to win through intimidation[2] and coercion. The evidence presented to the jury is adequate to support the trial court's damages finding on this ground.[3] In addition to injunctive relief, I would allow the Aquinos their damages for the intentional intimidation by petitioners.

SPECTOR, Justice, dissenting.

This case involves far more than claims of negligently-inflicted emotional distress. This case involves a clash between the right to privacy and the right to engage in expressive conduct. By failing to resolve or even address this issue, the majority needlessly prolongs this litigation and effectively endangers a family's most basic rights. I dissent.

## I.

The petitioners are South Texans For Life—a group devoted to "picketing and educating people that abortions are wrong"[1]—and nine individual demonstrators. The respondents are Dr. Eduardo Aquino; his wife, Mercedes Aquino; and their four young children. Dr. Aquino maintains an obstetrics and gynecological practice, a small part of which is devoted to providing abortion services.

Beginning in 1982, members of South Texans for Life regularly picketed Dr. Aquino's offices. Not once did Dr. Aquino

---

**1.** *See* factual discussion above, as well as Justice Spector's recitation of the undisputed facts of petitioners' conduct intended to intimidate the Aquino family. 853 S.W.2d at 521.

**2.** Petitioners apparently took to heart the message, if not the tactics, of ROBERT RINGER, WINNING THROUGH INTIMIDATION (1974).

**3.** Whether evidence of actual malice relating to protected expression is sufficiently clear and convincing to cross the constitutional barrier is a question of law for this court's independent review. *Doubleday & Co. v. Rogers*, 674 S.W.2d 751, 755 (Tex.1984).

**1.** Trial testimony of Eliseo Valenzuela, Jr.

attempt to stop or interfere with the picketing, even after his personal safety was threatened.

In 1988, the demonstrators decided to escalate their campaign by picketing the Aquinos' residence. For at least a month, the demonstrators gathered weekly in front of the Aquinos' home to sing, pray, and carry placards.[2] On each occasion, the protest activities began at 4:30 p.m., shortly after the Aquino children returned from school and several hours before Dr. Aquino was expected home from the office.

The demonstrations—which involved as many as twenty-five participants—created a circus-like spectacle in the Aquinos' neighborhood. Neighbors gathered to watch, and at times police cars lined the streets near the Aquino home. Noise from the activities was audible inside the Aquinos' house. The demonstrators photographed the Aquino home, videotaped it, and carried binoculars to view it. On one occasion, when Ms. Aquino attempted to leave the house for groceries, one of the demonstrators followed her in his car. Additionally, when Dr. Aquino arrived home, the demonstrators forced him to cross their picket line and sought to intimidate him by shouting, among other things, "Aren't you afraid?"

While the demonstrations were taking place outside the home, the household would be in an uproar, with children crying and locking themselves in their rooms. Ms. Aquino, overcome with anxiety for her family's safety, was "screaming, crying, running around the house," and literally shaking with fear.

The demonstrations outside the Aquinos' home were eventually stopped, but their effects on the family remain. Ms. Aquino has been diagnosed as suffering from post-traumatic stress disorder, and must rely on antidepressants to relieve her nervous condition. The oldest son, Eddie, became hos-

tile and aggressive; at the recommendation of a psychiatrist, he was placed in a psychiatric institution and then sent to live with an aunt in Paraguay. The academic performance of the other two sons began to suffer, and they showed other signs of emotional distress as well. Additionally, the commotion around the Aquinos' home damaged the family's social relationships with friends and classmates.

The Aquinos turned to the Texas courts for relief. After obtaining a temporary injunction,[3] the Aquinos proceeded to trial seeking damages and a permanent injunction to prevent further invasions of their privacy.

Based on a jury verdict for the Aquinos, the trial court awarded the family actual and punitive damages for the emotional distress they had suffered. Additionally, after considering the evidence and arguments, the trial court issued a permanent injunction ordering the demonstrators to refrain from picketing within 400 feet of the center of the Aquinos' lot.

The court of appeals upheld the trial court's injunction, noting the "significant governmental interest in protecting the privacy and domestic tranquility of the home," and concluding that "[t]he injunction in the instant case is narrowly tailored to serve such an interest." 800 S.W.2d 301, 305. However, the court of appeals set aside the award of damages for the Aquinos' emotional distress, concluding that such an award violated the demonstrators' freedom of speech under the Texas and United States Constitutions. *Id.* at 309.

## II.

Today, over five years after the Aquinos first sought relief, the majority dissolves the trial court's injunction and remands the

---

2. The signs bore messages including the following: "God Gives Life, Aquino Takes Away," "Nice House Dr. Eduardo, How Many Babies Paid the Price," "We Want a New Boat! Are You Pregnant," and "Beware Abortionist in Your Block."

3. The temporary injunction—which prohibited a wide range of conduct, including all residential picketing within one-half mile of the Aquinos' home—was later dissolved on the ground that it was overly broad. *Valenzuela v. Aquino,* 763 S.W.2d 43 (Tex.App.—Corpus Christi 1988, no writ).

entire cause to the trial court. Unlike the court of appeals, however, the majority does not address the extent to which a court may impose limitations on free expression. Rather, the majority bases its decision primarily on *Boyles v. Kerr*, 855 S.W.2d 593, in which this court has abolished the tort of negligent infliction of emotional distress.[4]

The main basis on which the Aquinos sought injunctive relief was not, in fact, a claim for negligent infliction of emotional distress; rather, it was a claim for invasion of privacy. The recitation of facts in the Aquinos' petition begins, "The picketing of Plaintiffs' home by Defendants is an invasion of their privacy. Specifically, said picketing is an unreasonable intrusion upon the seclusion of Plaintiffs."[5] At trial, the Aquinos submitted a jury question asking whether the picketing was "focused or directed toward the plaintiff's residence," based on a United States Supreme Court decision holding that such picketing can be prohibited in the interest of privacy.[6] At the trial court's subsequent hearing on the permanent injunction, the Aquinos' counsel stated that they sought injunctive relief "in order to prevent further invasion of the plaintiffs' privacy in this case."

After hearing the arguments at the permanent injunction hearing, the trial court prefaced its issuance of injunctive relief with the following:

> I believe Texas recognizes a right to privacy. This right, I believe, includes the right to be free from willful intrusions into one's personal life at home and at work—this right to be left alone from unwanted attention that may be caused by picketing or other unwanted demonstrations; and I believe that it is protected by injunctive relief.

In its final judgment, the trial court, "having considered the evidence and arguments," found and concluded that the Aquinos were entitled to injunctive relief. The Petitioners never complained that the basis for the injunction was unclear, because it was in fact unmistakably clear: the trial court was seeking to protect the Aquinos' residential privacy.

Injunctive relief is "designed primarily to grant relief against the threatened violation of a right when legal remedies are inadequate." *See Garland v. Shepherd*, 445 S.W.2d 602, 604 (Tex.Civ.App.—Dallas 1969, no writ); *see also Ex parte Tucker*, 110 Tex. 335, 338, 220 S.W. 75, 76 (1920); *see generally* 6 L. LOWE, REMEDIES: INJUNCTIONS AND OTHER EXTRAORDINARY PROCEEDINGS § 2 (Texas Practice 1973). When a right of privacy is recognized, "equity nearly always gives injunctive relief because of the obvious inadequacy of damages." GEORGE L. CLARK, PRINCIPLES OF EQUITY 316 (1937) (citations omitted). Moreover, equitable relief does not depend on recovering damages for past violations of the right; so long as the evidence and jury findings establish the likelihood of future violations,[7] injunctive relief is appropriate. *See* DAN B. DOBBS, REMEDIES: DAMAGES-EQUITY-RESTITUTION 120 (1973); *State v. Texas Pet Foods*, 591 S.W.2d 800, 803 (Tex.1979).[8]

---

**4.** I have dissented from the decisions in both *Boyles* and a companion cause, *Twyman v. Twyman*, 855 S.W.2d 619 (Tex.1993). My disagreement with the majority in this cause, however, extends well beyond my objections to the disposition of *Boyles* and *Twyman*.

**5.** This is apparently a reference to section 652B of the Restatement (2d) of Torts ("Intrusion upon Seclusion"), which describes a widely-recognized form of invasion of privacy.

**6.** *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988).

**7.** In equity cases, as in other cases, disputed questions of fact must be decided by the jury. Tex. Const. art. V, § 10; *State v. Credit Bureau*

*of Laredo, Inc.*, 530 S.W.2d 288, 292–93 (Tex. 1975).

**8.** In *Texas Pet Foods*, the jury, while finding many statutory violations, had failed to find a violation of a specific statutory provision; yet this court nonetheless upheld an injunction prohibiting future violations of that provision, reasoning that the trial court "obviously concluded, from the many other specific violations found by the jury, that the injunction was necessary and justified under the circumstances." 591 S.W.2d at 804. Thus, as to that statutory provision, a permanent injunction was upheld even without a determination of legal liability.

In attempting to distinguish *Texas Pet Foods*, the majority fails to even acknowledge the key fact of that case: "In addition to enjoining the

By the uncontroverted evidence, and a jury finding that the picketing was "focused or directed" at their residence, the Aquinos clearly established that their right to residential privacy was threatened. *See Frisby v. Schultz*, 487 U.S. 474, 487, 108 S.Ct. 2495, 2504, 101 L.Ed.2d 420 (1988); *Klebanoff v. McMonagle*, 380 Pa.Super. 545, 552 A.2d 677, 679 (1988). Thus, injunctive relief was warranted to protect the Aquinos' common-law right.

Nevertheless, the majority asserts that the injunctive relief cannot stand because the Aquinos failed to prove the elements of an invasion of privacy under section 652B of the Restatement (Second) of Torts. The majority cites no authority for the proposition that section 652B—which expressly refers to *liability*—also applies to a request for injunctive relief.

Even if section 652B does apply, the Aquinos have still met their burden. The only elements of a claim under this section are (1) an intentional intrusion upon the solitude or seclusion of another, which (2) would be highly offensive to a reasonable person. The first of these two requirements is satisfied by the jury finding that the picketing was "focused or directed" toward the Aquinos' residence. *See Frisby v. Schultz*, 487 U.S. at 486–88, 108 S.Ct. at 2503–04 ("focused" or "directed" picketing may be banned to protect residential seclusion). Additionally, because of this same finding, the second requirement was established as a matter of law. As the U.S. Supreme Court forcefully explained, focused residential picketing is, by its nature, highly offensive to the ordinary person:

> The devastating effect of targeted picketing on the quiet enjoyment of the home is beyond doubt.... The resident is figuratively, and perhaps literally, trapped within the home, and because of the unique and subtle impact of such picketing is left with no ready means of avoiding the unwanted speech. Thus, the 'evil' of targeted residential picketing, 'the very presence of an unwelcome visitor at the home,' is 'created by the medium of expression itself.'

*Frisby v. Schultz*, 487 U.S. at 486–87, 108 S.Ct. at 2503–04 (citations omitted).

Disregarding *Frisby*, the majority asserts that unresolved factual disputes made injunctive relief improper. In fact, almost all of the essential facts were uncontested. The Petitioners did not deny that they had planned and engaged in a continuing course of conduct that included weekly picketing outside Dr. Aquino's residence. Nor did they deny that they sought to intimidate Dr. Aquino; one of the Petitioners, for example, testified as follows:

> Question: ... [Y]ou admitted a moment ago that your purpose of picketing at his home was to intimidate the doctor; is that right?
>
> Answer: Yes, sir.[9]

Nor did the Petitioners deny that they intended to interfere with Dr. Aquino's privacy. Another of the Petitioners testified as follows:

> Question: Didn't you consider your conduct to be an invasion of his privacy by picketing the home where his wife and children were?
>
> Answer: Yes, sir.[10]

In other parts of their testimony, as the majority notes, the Petitioners sought to cast their conduct in different terms; but at no point did the Petitioners deny that their foremost objective was intimidation.

The only disputed aspect of the Aquinos' privacy claim concerned whether the picketing was focused upon the Aquinos' residence: the Petitioners claimed that they had not focused on Dr. Aquino's house in particular, but were picketing his neighbors' homes as well. At Dr. Aquino's request, this issue was submitted to the jury.

---

specific violations found by the jury, the trial court further enjoined Texas Pet Foods from an activity which the jury failed to find was occurring." *Id.* This court unanimously concluded that "[t]he trial court was not precluded by the jury's failure to answer special issue No. 1 affirmatively from exercising its equity jurisdiction and finding that injunctive relief from future violations under these circumstances was warranted." *Id.*

**9.** Trial testimony of Eliseo Valenzuela, Jr.

**10.** Trial testimony of Charles W. Bolton.

The jurors rejected the Petitioners' contention, expressly finding that the picketing was "focused or directed" toward the Aquinos' residence.

The injunction in this case is supported by the pleadings, the evidence, and the jury's affirmative finding on the only disputed fact issue relevant to the invasion of privacy: namely, whether the Petitioners' picketing was focused on the Aquinos' residence. Thus, irrespective of this court's decision in *Boyles v. Kerr*, the injunctive relief granted by the trial court should still stand to protect the Aquinos from further invasions of privacy.

### III.

Because the viability of the trial court's injunction is not affected by *Boyles v. Kerr*, this court has an obligation to consider whether the injunction interferes with the Petitioners' freedom of speech under the Texas and United States Constitutions. This court has unquestionably treated peaceful picketing as a constitutionally-protected right. *See, e.g., International Union of Operating Eng'rs v. Cox*, 148 Tex. 42, 219 S.W.2d 787, 792–93 (1949) (union members' right to picket protected under the First and Fourteenth Amendments); *Ex parte Henry*, 147 Tex. 315, 325–26, 215 S.W.2d 588, 592 (1948) (picketing by union members in front of plant entrance). Moreover, we recently recognized that the free speech provision in the Texas Bill of Rights, Tex. Const. art. I, § 8, provides greater rights of free expression than its federal equivalent. *Davenport v. Garcia*, 834 S.W.2d 4, 10 (Tex.1992). Thus, prior restraints on speech presumptively violate the Texas Constitution, even if not the federal constitution. *Id.*

But Texas law has also extended broad protection to the right of privacy. In the seminal Texas case, this court noted that the right of privacy has been defined as "the right of an individual to be left alone, to live a life of seclusion." *Billings v. Atkinson*, 489 S.W.2d 858, 859 (Tex.1973) (upholding homeowner's recovery based on illegal wiretap at his residence). So important is this right in Texas that, independent

of the federal constitution, the Texas Constitution protects personal privacy from unreasonable intrusion. *Texas State Employees Union v. Texas Dep't of Mental Health and Mental Retardation*, 746 S.W.2d 203, 205 (Tex.1987).

One important function of the right of privacy has been to preserve the sanctity of the home. This court has long viewed the household as a sanctuary—"a place of residence for the family, where the independence and security of a home may be enjoyed," free from "harassment and disturbance." *Iken v. Olenick*, 42 Tex. 195, 198 (1875); *see also Porter v. Southwestern Public Service Co.*, 489 S.W.2d 361, 365 (Tex.Civ.App.—Amarillo 1973, writ ref'd n.r.e.) (zoning ordinances may be used to protect residential area from free exercise of property rights). This view has been central to our privacy jurisprudence; for example, in describing the Texas Constitution's protection of privacy, this court noted that two provisions in our bill of rights "guarantee the sanctity of the individual's home and person against unreasonable intrusion." *Texas State Employees Union*, 746 S.W.2d at 205 (discussing Tex. Const. art. I, §§ 9, 25). Accordingly, Texas courts have viewed harassment in one's residence as an intrusion upon seclusion in violation of the right of privacy. *See Donnel v. Lara*, 703 S.W.2d 257 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.).

The conduct involved in this case represents a threat to other privacy rights as well. The right of privacy "is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Roe v. Wade*, 410 U.S. 113, 153, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1972); *see also Texas State Employees Union*, 746 S.W.2d at 205 (citing *Roe v. Wade*). Increasingly, however, the ability of women and families to make this decision has been severely constricted. Targeting doctors as the "weak link" in the provision of abortion services, organizations across the state and nation have used a strategy of harassment and intimidation to "dissuade skilled clinicians from entering this field or convince them to quit." David A. Grimes, *Clini-*

*cians Who Provide Abortions: The Thinning Ranks,* 80 OBSTETRICS & GYNECOLOGY 719, 721 (1992). These efforts have succeeded, in large part, in making abortion services unavailable: as of 1988, 83 percent of United States counties had no identified provider of abortion services. *Id.* at 719. Dr. Grimes concludes that "[c]ommunities must curb the harassment of clinicians"; otherwise, he warns, "the legacy of *Roe v. Wade* may become an empty promise." *Id.* at 722.

Because of the vital privacy interests at stake, I would hold that the trial court's injunction is a valid restriction of the Petitioners' right to engage in expressive conduct. Individuals are not required to become captives in their own homes, with no "recourse of escape" from intrusive, unwanted speech. *Carey v. Brown,* 447 U.S. 455, 479, 100 S.Ct. 2286, 2299, 65 L.Ed.2d 263 (1980) (Rehnquist, J., dissenting); *see also Frisby v. Schultz,* 487 U.S. at 487, 108 S.Ct. at 2504; *Klebanoff,* 552 A.2d at 679. Unlike the half-mile prohibition previously set aside, 763 S.W.2d at 45, the present 400–foot prohibition, measured from the center of the residential lot, is not so broad as to preclude all picketing or other activities in the surrounding neighborhood. Nor does this prohibition foreclose the Petitioners' right to express their views through alternate channels. The injunction does, however, preclude picketing focused on the Aquino household. Because such picketing interferes with the Aquinos' right of privacy, it is not protected under either the Texas or the United States Constitutions. *See Frisby v. Schultz,* 487 U.S. at 486–87, 108 S.Ct. at 2503–04; *Garcia v. Gray,* 507 F.2d 539, 544–45 (10th Cir.1974); *Degregory v. Giesing,* 427 F.Supp. 910, 915 (D.Conn.1977); *Hall v. Hawaiian Pineapple Co.,* 72 F.Supp. 533, 537 (D.Haw.1947); *Dayton Women's Health Center v. Enix,* 68 Ohio App.3d 579, 589 N.E.2d 121, 127 (1991); *Town of Barrington v. Blake,* 568 A.2d 1015, 1020–21 (R.I.1990); *Klebanoff,* 552 A.2d at 679; *Wauwatosa v. King,* 49 Wis.2d 398, 182 N.W.2d 530, 536–37 (1971).

### IV.

The injunction ordered by the trial court is not invalidated by *Boyles,* nor is it invalidated by constitutional rights of free expression. However, because "debate on public issues should be uninhibited, robust, and wide-open," *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), I agree with the court of appeals that the award of damages in this case cannot stand.

For this same reason, I regret that the majority has avoided discussion of the serious issues this cause presents. An "uninhibited, robust, and wide-open" discussion of the Aquinos' right to privacy could finally resolve this litigation, and would guide future courts and litigants in dealing with the tension between rights of privacy and of expressive conduct. Unfortunately, the parties will now have to resume their dispute in the lower courts and elsewhere before their questions are finally answered.