# COURT OF APPEALS
# THIRTEENTH DISTRICT OF TEXAS
# CORPUS CHRISTI – EDINBURG


## NUMBER 13-14-00064-CV

| | |
|---|---|
| **QUALITY LEASE AND RENTAL HOLDINGS, LLC** | **Appellant,** |

**v.**

| | |
|---|---|
| **GRETA YVETTE MOBLEY, DAVID MICHAEL MOBLEY, TEXAS QUALITY MATS, LLC, TEXAS QUALITY GATE GUARD SERVICES, LLC, AND QUALITY LEASE AIR SERVICE, LLC,** | **Appellees.** |

## NUMBER 13-14-00066-CV

| | |
|---|---|
| **ALLAN MARTIN,** | **Appellant,** |

**v.**

| | |
|---|---|
| **GRETA YVETTE MOBLEY, DAVID MICHAEL MOBLEY, TEXAS QUALITY MATS, LLC, TEXAS QUALITY GATE GUARD SERVICES, LLC, AND QUALITY LEASE AIR SERVICE, LLC,** | **Appellees** |

## MEMORANDUM OPINION

**Before Justices Rodriguez, Garza and Benavides**
**Memorandum Opinion by Justice Garza**

These two interlocutory appeals arise from a commercial dispute involving appellees Greta Yvette Mobley, David Michael Mobley, Texas Quality Mats, LLC, Texas Quality Gate Guard Service, LLC, and Quality Lease Air Service, LLC (collectively "Mobley"). In appellate cause number 13-14-00064-CV, appellant Quality Lease and Rental Holdings ("QLRH") contends that the trial court erred in denying its motion to compel arbitration. In appellate cause number 13-14-00066-CV, appellant Allan Martin contends that the trial court erred in denying his special appearance. We affirm the trial court's denial of QLRH's motion to compel arbitration, and we affirm in part and reverse and render in part with respect to Martin's special appearance.

### I. BACKGROUND

Michael Mobley is a Texas resident who owned oilfield service companies Quality Lease Service, LLC ("Quality Lease") and Quality Lease Rental Service ("Quality Rental"). QLRH is a Delaware limited liability company formed by Martin, a Florida resident. QLRH is owned by Rocaceia, LLC ("Rocaceia"), which is also a Delaware limited liability company formed and managed by Martin.

On December 31, 2012, QLRH entered into a "Purchase and Contribution Agreement" (the "Purchase Agreement") by which it agreed to obtain all the stock of

Quality Lease and Quality Rental from Mobley in exchange for around $60 million. Under the Purchase Agreement, Mobley was to retain a minority interest in QLRH through a holding company. The following arbitration clause was included as section 10.10 of the Purchase Agreement:

> Notwithstanding any provision of this Agreement to the contrary, all disputes, controversies or claims (with the exception of Third Party Claims and any claim for equitable relief, including but not limited to injunctive relief or specific performance) arising out of or relating to this Agreement and the transactions contemplated hereby shall be resolved by agreement among the parties, or, if not so resolved within thirty (30) days then the dispute shall be resolved by final and binding arbitration in Tampa, Florida pursuant to the then existing Commercial Arbitration Rules of the American Arbitration Association ["AAA"]. The arbitrator will apply the law of the State of Florida, United States of America, as to both substantive and procedural questions. Such arbitration will take place before a single arbitrator. The single arbitrator shall be agreed upon by the parties to the arbitration. In the event the parties cannot agree upon an arbitrator within twenty (20) calendar days after the effective date of either party's notice to arbitrate, the arbitrator will be appointed pursuant to the Commercial Arbitration Rules of the American Arbitration Association. . . .

The Purchase Agreement also contained the following section 10.11, entitled "Governing Law; Submission to Jurisdiction; Waiver of Jury Trial":

> (a)     This Agreement shall be governed by and construed in accordance with the internal laws of the State of Florida without giving effect to any choice or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than those of the State of Florida.
>
> (b)     ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS (EXCEPT AS PROVIDED FOR OTHERWISE THEREIN) OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, TO THE EXTENT NOT ARBITRABLE IN ACCORDANCE WITH SECTION 10.10, MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF FLORIDA IN EACH CASE LOCATED IN THE CITY OF TAMPA AND COUNTY OF HILLSBOROUGH, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. . . . THE PARTIES

3

IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION, OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN ANY INCONVENIENT FORUM.

(c)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. . . .

The same day that the Purchase Agreement was executed, Martin and Michael Mobley executed a separate "Employment Agreement" as contemplated in the Purchase Agreement.  Under the Employment Agreement, QLRH agreed to employ Mobley as its president for three years.[1]  The Employment Agreement contained non-compete, non-disclosure, and exclusivity clauses, as well as a waiver of jury trial similar to the one included in the Purchase Agreement; however, the Employment Agreement did not contain its own arbitration clause.  The Employment Agreement stated:

This Agreement will in all respects be governed by, and construed in accordance with the laws of the State of Texas.  The parties agree that any action brought by either party under or in relation to this Agreement, shall be brought in, and each party agrees to and does hereby submit to the jurisdiction and venue of, any state court located in the County of Hillsborough, Florida (or such other county as the headquarters of [QLRH] may then be located) or in the federal district court of the United States District Court for the Middle District of Florida, Tampa Division.

---

[1] The Employment Agreement further stated:

Notwithstanding anything in the foregoing to the contrary, [Mobley] understands and acknowledges that his employment with [QLRH] is "at-will" which means that either [Mobley] or [QLRH] may terminate the employment relationship and this Agreement at any time, for any reason, including with or without Cause (as defined herein), subject to the provisions set forth in this Agreement.

4

On April 6, 2013, QLRH notified Mobley that he was being placed on administrative leave pending an investigation as to whether he had breached the Employment Agreement and his fiduciary duty to QLRH by, among other things, diverting QLRH business to other companies affiliated with Mobley. Two days later, QLRH filed suit against Mobley in the United States District Court for the Middle District of Florida, alleging breach of contract, breach of fiduciary duty, and fraud. QLRH alleged that Mobley had violated various provisions of the Employment Agreement. QLRH also alleged that Mobley made a number of false statements in connection with the sale of Quality Lease and Quality Rental, including misrepresentations regarding the "revenue and earnings of the QLRH-purchased entities." Mobley moved to dismiss the federal court lawsuit, asserting that QLRH's claims were meritless and merely reflected Martin's "buyer's remorse" over the December 31, 2012 transaction.

Mobley then filed the instant suit in the 329th District Court of Wharton County, Texas, on April 10, 2013, asserting claims of conversion and invasion of privacy against QLRH. Mobley later filed an amended petition naming Martin as an additional defendant and asserting an additional claim of assault and battery.[2] Martin filed a special appearance in the Texas suit contending that the court lacked personal jurisdiction over him in his personal capacity. QLRH answered the Texas suit and filed counterclaims for breach of the Employment Agreement, equitable rescission of the Purchase Agreement, injunctive relief, and tort damages. QLRH then filed an agreed motion to dismiss the

---

[2] Mobley's First Amended Petition also set forth a claim of negligent hiring, supervision, and retention. Mobley abandoned this claim, however, in his Third Amended Petition, which was the live pleading at the time the trial court rendered the judgments on appeal.

5

Florida federal court lawsuit without prejudice. The agreed motion noted that suit was pending in Texas state court and stated: "The parties agree that it is most efficient for all disputes among them and their affiliates to be resolved in Texas."[3]

Mobley's pleadings in the Texas suit were initially limited to claims arising from the Employment Agreement, which did not contain an arbitration clause, and claims for equitable relief arising under the Purchase Agreement, which were explicitly excluded under that contract's arbitration clause. On November 4, 2013, however, Mobley filed a Third Amended Petition raising claims at law that arose under the Purchase Agreement[4] and therefore, according to QLRH, were subject to arbitration. In particular, Mobley alleged in his Third Amended Petition that Martin "never intended to perform" his obligations under the Purchase Agreement and that he fraudulently induced Mobley to enter into the agreement.

Believing that these new claims were covered by the Purchase Agreement's arbitration clause, QLRH filed a motion to compel arbitration in the Texas suit. In response to the motion, Mobley contended that QLRH had waived arbitration by filing its suit in Florida federal court. After a hearing, the trial court denied the motion and QLRH appealed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.016 (West, Westlaw through 2013 3d C.S.) (permitting interlocutory appeals "under the same circumstances that an appeal

_____

[3] On June 14, 2013, Mobley's counsel sent an arbitration demand letter to Martin and QLRH alleging that: (1) Martin and QLRH "have not complied with the 'Post-Closing Adjustment' requirements contained in Section 2.04 of the [Purchase] Agreement"; (2) Mobley "failed to account for and pay the costs associated with housing units that were incurred by [Mobley]"; and (3) Martin and QLRH have "failed to complete 2012 tax filings." According to QLRH, Mobley never filed a formal demand for arbitration with AAA and no arbitration was ever initiated on these claims.

[4] The Third Amended Petition stated in its venue section that the lawsuit "arises out of business dealings between the parties in Wharton County, Texas, and it requires the construction of, and seeks relief under, [the Purchase Agreement] dated December 31, 2012, and other documents entered into on that same date."

from a federal district court's order or decision would be permitted by 9 U.S.C. Section 16"); *see also* 9 U.S.C.A. § 16(a)(1)(C) (West, Westlaw through P.L. 113-92) (stating that an appeal may be taken from, *inter alia*, an order denying an application to compel arbitration). The trial court also denied Martin's special appearance, and Martin appealed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7) (West, Westlaw through 2013 3d C.S.) (permitting appeal of interlocutory order granting or denying special appearance).

## II. MOTION TO COMPEL ARBITRATION

It is undisputed that the new claims raised in Mobley's Third Amended Petition "ar[ose] out of or relat[ed] to" the Purchase Agreement and were therefore covered by the arbitration clause contained therein. The only question with regard to those claims, therefore, is whether or not QLRH waived its right to arbitrate. Mobley asserts that QLRH waived arbitration by, among other things: (1) filing claims related to the Purchase Agreement in its Florida federal suit; (2) filing counterclaims related to the Purchase Agreement in the Texas suit; (3) stating in the agreed motion to dismiss the federal suit that "all disputes" between the parties would be litigated in Texas; (4) "ignoring" Mobley's arbitration demands; and (5) conducting discovery.

## A. Standard of Review and Applicable Law

A party seeking to compel arbitration must establish that (1) there is a valid arbitration agreement, and (2) the claims raised fall within that agreement's scope. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005) (orig. proceeding). Federal and Texas law strongly favor arbitration, and arbitration agreements that comport with traditional principles of contract law will be upheld. *Forest Oil Corp. v. McAllen,* 268 S.W.3d 51, 56 (Tex. 2008). If a trial court finds that the claim falls within the scope of a

7

valid arbitration agreement, the court has no discretion but to stay its own proceedings and compel arbitration. *Id.*

Generally, we review a trial court's denial of a motion to compel arbitration for abuse of discretion. *Schlumberger Tech. Corp. v. Baker Hughes Inc.*, 355 S.W.3d 791, 800 (Tex. App.—Houston [1st Dist.] 2011, no pet.). However, when an appeal from a denial of a motion to compel arbitration turns on a legal determination, we apply a de novo standard. *Forest Oil Corp.,* 268 S.W.3d at 55 n.9; *see Rachal v. Reitz*, 403 S.W.3d 840, 843 (Tex. 2013) ("When reviewing a denial of a motion to compel arbitration, we defer to the trial court's factual determinations that are supported by evidence but review the trial court's legal determinations de novo.").

Where, as here, the trial court makes no written findings of fact and conclusions of law in support of its ruling, "all facts necessary to support the judgment and supported by the evidence are implied."[5] *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009) (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)). We will affirm the ruling if it can be upheld on any legal theory supported by the evidence. *In re W.E.R.*, 669 S.W.2d 716, 716 (Tex. 1984).

## B. Choice of Law

As an initial matter, we address what body of substantive law should be applied to the question of whether QLRH waived arbitration under section 10.10 of the Purchase Agreement. Mobley contends that Florida state law must apply because of the choice of

---

[5] At the conclusion of the December 11, 2013 hearing on QLRH's motion to compel arbitration, the trial court orally recited several conclusions of law, to which QLRH refers extensively in its brief. However, no written findings of fact or conclusions of law were filed, and we may not consider a trial court's oral comments at a hearing as a substitute for formal written findings of fact and conclusions of law. *See In re W.E.R.*, 669 S.W.2d 716, 716 (Tex. 1984) (citing TEX. R. CIV. P. 296).

law provision contained in the Purchase Agreement. QLRH contends that, although Florida law would apply to substantive issues due to the choice-of-law provision, the Federal Arbitration Act ("FAA") applies exclusively to the question of whether arbitration was waived.[6]

We agree with Mobley that Florida law applies to the question of whether arbitration has been waived. As noted, the choice of law provision in section 10.11 of the Purchase Agreement states:

> This Agreement shall be governed by and construed in accordance with the internal laws of the State of Florida without giving effect to any choice or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than those of the State of Florida.

QLRH argues that the FAA applies exclusively because the Purchase Agreement concerned a transaction involving interstate commerce. *See Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 269–70 (Tex. 1992) (stating that the FAA "applies to all suits in state and federal court when the dispute concerns a contract evidencing a transaction involving commerce") (citing *Perry v. Thomas*, 482 U.S. 483, 489 (1987)). However, the FAA does not state what is necessary to show that a party waived arbitration, and there is nothing in the FAA precluding parties from contracting to have a particular body of substantive law apply to the statutorily-unaddressed question of waiver. Moreover, the

---

[6] QLRH further argues that, "given the nature of the trial court's findings," the choice of law issue is irrelevant here because "[t]he trial court's error was in misinterpreting which claims were subject to the arbitration clause and incorrectly interpreting the claims at issue in the Florida litigation." However, as noted, the trial court's oral comments do not constitute formal findings of fact or conclusions of law. *See id.* In any event, we find that the choice of law issue is relevant because, unlike Texas law, Florida law provides that a party claiming waiver of arbitration is not obligated to show that it was prejudiced. *Compare Raymond James Fin. Servs., Inc. v. Saldukas*, 896 So.2d 707, 711 (Fla. 2005) ("[T]here is no requirement for proof of prejudice in order for there to be an effective waiver of the right to arbitrate.") *with Perry Homes v. Cull*, 258 S.W.3d 580, 589–90 (Tex. 2008) ("[A] party waives an arbitration clause by substantially invoking the judicial process to the other party's detriment or prejudice.").

9

United States Supreme Court has held that the FAA does not pre-empt state arbitration law because Congress's enactment of the statute did not evince an intent to "occupy the entire field of arbitration." *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 469 (1989).

For the foregoing reasons, we conclude that Florida substantive law applies to the question of whether QLRH waived arbitration under section 10.10 of the Purchase Agreement. We now proceed to consider the merits of that question.

## C.     Analysis

Waiver is the voluntary and intentional relinquishment of a known right or conduct which implies the voluntary and intentional relinquishment of a known right. *Raymond James Fin. Servs., Inc. v. Saldukas*, 896 So.2d 707, 711 (Fla. 2005). The right to arbitration, like any contract right, can be waived. *Id.* A party's contractual right to arbitration may be waived by actually participating in a lawsuit or taking action inconsistent with that right. *Id.*

> The . . . strong federal policy in favor of enforcing arbitration agreements is based upon the enforcement of contract, rather than a preference for arbitration as an alternative dispute resolution mechanism. Thus, the question of whether there has been waiver in the arbitration agreement context should be analyzed in much the same way as in any other contractual context. The essential question is whether, under the totality of the circumstances, the defaulting party has acted inconsistently with the arbitration right.

*Id.* (quoting *Nat'l Found. for Cancer Research v. A.G. Edwards & Sons, Inc.*, 821 F.2d 772, 774 (D.C. Cir. 1987)) (internal quotations and citations omitted). Under Florida law, "there is no requirement for proof of prejudice in order for there to be an effective waiver of the right to arbitrate." *Id.*

10

QLRH asserts that the claims it brought in its Florida federal suit were related solely to the Employment Agreement and that, therefore, its litigation of those claims did not constitute "action inconsistent" with its right to arbitrate under the Purchase Agreement. *See id.* However, QLRH's complaint in the federal suit alleged in part that Mobley committed fraud by, among other things, making false representations prior to the sale. The complaint alleged that QLRH "relied on Mobley's false representations to its detriment" and requested money damages. These claims appear to implicate the circumstances surrounding the development and execution of the Purchase Agreement.

Even if we were to assume that QLRH's federal claims related exclusively to the Employment Agreement, those claims were nevertheless arbitrable. As noted, though the Employment Agreement itself did not contain its own arbitration clause, the Purchase Agreement's very broad arbitration clause applied to "all disputes, controversies or claims (with the exception of Third Party Claims and any claim for equitable relief, including but not limited to injunctive relief or specific performance) arising out of or relating to this Agreement and the transactions contemplated hereby." Crucially, the Purchase Agreement specifically defined "Transaction Documents" as including "the Mobley Employment Agreement." From our review of the entire Purchase Agreement, we are left with no doubt that the transaction evidenced by the Employment Agreement was one of the "transactions contemplated" by the Purchase Agreement. Accordingly, claims arising from Mobley's employment with QLRH—"with the exception of Third Party Claims and any claim for equitable relief"—were subject to arbitration. It follows that, by filing suit in Florida on claims arising from the Employment Agreement, and by requesting money damages on those claims, QLRH acted inconsistently with its right to arbitrate. *See id.*

11

Further, QLRH filed counterclaims in Mobley's Texas state suit which mirrored the claims brought by QLRH in federal court. Those claims arose under the Employment Agreement, and the counterpetition sought money damages.[7] Moreover, the counterpetition did not state that the counterclaims were brought subject to the trial court's ruling on the motion to compel arbitration. The filing of those counterclaims, therefore, also constituted action inconsistent with QLRH's right to arbitrate under the Purchase Agreement. *See id.*

Because QLRH "acted inconsistently with the arbitration right," *id.*, the trial court did not err in denying QLRH's motion to compel arbitration.[8] We overrule QLRH's issue on appeal.

## III. SPECIAL APPEARANCE

### A. Standard of Review

Issues of personal jurisdiction are questions of law and are reviewed de novo. *Retamco Operating, Inc.*, 278 S.W.3d at 337 (citing *BMC Software Belg.*, 83 S.W.3d at 795). The plaintiff has the initial burden to "plead sufficient allegations to confer jurisdiction." *Id.* Once that burden is met, the defendant seeking to avoid the court's

---

[7] QLRH sought rescission of the Purchase Agreement on grounds that Mobley committed fraud by making misrepresentations as to the assets of Quality Lease and Quality Rental. QLRH alleged that Mobley made those misrepresentations "with the intention that [QLRH] rely on them," and that "[QLRH] did rely on them in purchasing [Quality Lease] and [Quality Rental], in executing the [Purchase] Agreement, and in partially paying the consideration therefor in excess of $60 million." Rescission is an equitable remedy, *see, e.g., Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 826 (Tex. 2012), and the arbitration clause at issue did not apply to actions in equity, but QLRH's counterpetition also asked for money damages based on "[e]ach of the acts and omissions of" Mobley. QLRH's filing of this counterclaim therefore arguably also constituted "action inconsistent" with the right to arbitrate. *See Raymond James Fin. Servs., Inc. v. Saldukas*, 896 So. 2d 707, 711 (Fla. 2005).

[8] In light of this conclusion, we need not address Mobley's assertions that QLRH waived arbitration by other means. *See* TEX. R. APP. P. 47.1; *In re W.E.R.*, 669 S.W.2d at 716 ("Where findings of fact and conclusions of law are not properly requested and none are filed, the judgment of the trial court must be affirmed if it can be upheld on any legal theory that finds support in the evidence.").

jurisdiction takes on the burden to negate "all potential bases for jurisdiction pled by the plaintiff." *Id.*

> The defendant can negate jurisdiction on either a factual or legal basis. Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations. The plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction. Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction.

*Kelly v. Gen. Interior Const., Inc.*, 301 S.W.3d 653, 659 (Tex. 2010) (footnotes omitted).

When, as here, a trial court does not issue formal written findings of fact or conclusions of law to support its special-appearance determination, we presume that all factual disputes were resolved in favor of the trial court's ruling. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 871–72 (Tex. 2010).

## B.    Applicable Law

Non-residents are subject to the personal jurisdiction of Texas courts if: (1) jurisdiction is authorized under the state's long-arm statute; and (2) jurisdiction comports with guarantees of the United States and Texas Constitutions. *Id.* Under Texas's long-arm statute, a non-resident defendant is within the court's jurisdiction if the defendant does business in the state. *See PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 166 (Tex. 2007). A non-resident "does business in this state" if the non-resident, among other things, "commits a tort in whole or in part in this state." TEX. CIV. PRAC. & REM. CODE ANN. § 17.042(2) (West, Westlaw through 2013 3d C.S.). The Texas Supreme Court has held that, under the "broad language" of Texas's long-arm statute, personal

13

jurisdiction extends "as far as the federal constitutional requirements of due process will permit." *BMC Software Belg.*, 83 S.W.3d at 795 (citing *U–Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)).

The exercise of personal jurisdiction is constitutional when (1) the non-resident defendant has established minimum contacts with the forum, and (2) the exercise of jurisdiction follows the traditional notions of fair play and substantial justice. *PHC–Minden, L.P.*, 235 S.W.3d at 166 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Only in rare cases will the exercise of jurisdiction not comport with fair play and substantial justice when the non-resident defendant has purposefully established minimum contacts with the forum state. *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991).

Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either specific jurisdiction or general jurisdiction. *BMC Software Belg.*, 83 S.W.3d at 795–96 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–14 (1984)). Specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum. *Id.* In contrast, general jurisdiction is present when a defendant's contacts in a forum are continuous and systematic so that the forum may exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state. *Id.*

## C.    Analysis

In his special appearance, Martin argued, as he does on appeal, that: (1) the trial court did not have general jurisdiction over him due to the fiduciary shield doctrine; and

14

(2) Mobley alleged insufficient facts to establish specific jurisdiction over him.  In response, Mobley did not dispute that the trial court lacked general jurisdiction over Martin.  Accordingly, we address only whether the court had specific jurisdiction over Martin with respect to the claims raised by Mobley.[9]  We will do so on a claim-by-claim basis.  *See Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274 (5th Cir. 2006) ("[I]f a plaintiff's claims relate to different forum contacts of the defendant, specific jurisdiction must be established for each claim."); *cf. Touradji v. Beach Capital P'ship, L.P.*, 316 S.W.3d 15, 26 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (noting that "when separate claims are based on the same forum contacts, a separate analysis of each claim is not required"); *cf. also Davis Invs., VI, LP v. Holtgraves*, No. 14–08–00222–CV, 2009 WL 975961, at *12 n.7 (Tex. App.—Houston [14th Dist.] Feb. 26, 2009, pet. denied) (mem. op.) (agreeing "with other courts that generally a specific-jurisdiction analysis should be performed on a claim-by-claim basis" but declining to do so because plaintiff's claims all arose from same facts and defendant asserted single basis for his special appearance to each claim).

In his first amended petition, Mobley brought claims of conversion, invasion of privacy, and assault and battery against all defendants, including Martin in his individual capacity.  Martin then filed his special appearance on August 22, 2013.  Subsequently, Mobley filed two additional amended petitions, the latter of which contained additional

---

[9] The parties devote much briefing to the issue of whether the fiduciary shield doctrine precludes personal jurisdiction over Martin.  That doctrine "prevents the attribution to corporate agents of contacts with Texas resulting solely from transacting the corporate principal's business in the state."  *Stull v. LaPlant*, 411 S.W.3d 129, 134 (Tex. App.—Dallas 2013, no pet.).  However, "courts applying the fiduciary shield doctrine have limited its application to attempts to exercise *general* jurisdiction over a nonresident defendant."  *Cagle v. Clark*, 401 S.W.3d 379, 390 (Tex. App.—Texarkana 2013, no pet.) (emphasis in original).  Because Mobley did not dispute that the trial court lacked general jurisdiction over Mobley, we do not address whether the fiduciary shield doctrine applies.

15

allegations that Martin committed fraud in the inducement and breach of fiduciary duty. Mobley argues on appeal that Martin did not preserve any jurisdictional challenge to the fraud and breach of fiduciary duty claims because his special appearance was filed before those claims were brought and therefore did not address those claims. We agree. Although both parties filed responses, replies, and briefs on the personal jurisdiction issue, Martin did not file any pleading amending or supplementing his special appearance motion to address the fraud and fiduciary duty claims. *See* TEX. R. CIV. P. 120a(1) (stating that a special appearance "may be amended to cure defects"). Martin therefore did not preserve any appellate issue with regard to those claims.[10] *See* TEX. R. APP. P. 33.1; *see also State v. C.J.F.*, 183 S.W.3d 841, 852 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("Although subject matter jurisdiction may be raised for the first time on appeal, whether the trial court had personal jurisdiction may not."). We overrule Martin's issue on appeal as to those claims, and we proceed to address the remaining claims—namely, conversion, invasion of privacy, and assault and battery.

Mobley's conversion and invasion of privacy[11] claims alleged that Martin broke into a safe owned by Mobley but kept at QLRH's offices in El Campo, Texas, and that Martin "wrongfully exercised dominion and control" over Mobley's personal property, including

---

[10] We note that specific jurisdiction as to QLRH's fraud and fiduciary duty claims would be based on a wholly separate and distinct set of "contacts" with Texas than the assault, conversion and invasion of privacy claims. Accordingly, we believe QLRH was required to address jurisdiction as to the fraud and fiduciary duty claims specifically in order to preserve that issue for appellate review. *See* TEX. R. APP. P. 33.1 (stating that, to preserve an issue for appellate review, a party must make a complaint to the trial court with "sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context"); *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274 (5th Cir. 2006) ("[I]f a plaintiff's claims relate to different forum contacts of the defendant, specific jurisdiction must be established for each claim.").

[11] This type of invasion of privacy claim has been characterized as an "intrusion upon seclusion" claim. *Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex. 1993). An unwarranted intrusion upon seclusion is proved by showing (1) an intentional intrusion, physical or otherwise, upon another's solitude, seclusion, or private affairs or concerns that (2) would be highly offensive to a reasonable person. *Id.*

"personal income tax returns and other business and financial papers," which were contained in the safe. The assault claim alleged that QLRH's security guards, at Martin's direction, assaulted Mobley when he attempted to retrieve personal belongings from QLRH's offices after he had been placed on administrative leave.

As part of his response to Martin's special appearance, Mobley filed an affidavit in which he stated, in relevant part, as follows:

> On April 6, 2013, I was notified that I had been administratively placed on leave by [QLRH]. After this notification, I entered the premises located at 480 County Road 355, El Campo, Wharton County, Texas, the location of many of my personal items.
>
> I encountered Allan Martin while at this location. I know Mr. Martin as I concluded a sale of my business to him in December 2012 and his company, [QLRH], was leasing the premises located at 480 County Road 355, El Campo, Wharton County, Texas. [QLRH] is managed and controlled by Allan Martin. [QLRH] conducts business in the State of Texas and has over 75 employees and other assets located in Texas.
>
> I informed Mr. Martin that I was there to retrieve my personal belongings. Mr. Martin was there with armed security guards. I proceeded to go to my office on the second floor when I saw·Mr. Martin motion to the security guards to prevent my access to the second floor. I was placed in a chokehold for several moments by the security guards. My son who was with me was pepper sprayed by the security guards when he attempted to help me. It was apparent to me based on the non-verbal conduct of Mr. Martin that included his gestures and motions, that he was in control of and directed the security guards in their activities including their assault of me.

Mobley's son stated the following in an affidavit attached to the response:

> When my father went to go to the second floor, I saw Mr. Martin motion to the security guards, by the nod of his head, to halt my father from going upstairs. Immediately after Mr. Martin motioned to the security guards, the security guards grabbed my father and placed him in a chokehold. Immediately, I moved to assist my father and I was pepper-sprayed by the security guards.

In reply to Mobley's response and affidavit evidence, Martin argued that the evidence "unequivocally demonstrates" that the security personnel were not acting at his

17

direction when they allegedly assaulted Mobley. In an affidavit attached to his reply, Martin stated, in relevant part:

> 2. In my personal capacity, I did not employ The BlackStone Group Partners LP ["BSG"], a licensed private security firm. [BSG] was hired by [QLRH] as an independent contractor to protect its employees and property after Michael Mobley had assaulted its employees and threatened further physical harm to both. I did not direct nor did I supervise the agents of [BSG].
>
> 3. On April 6, 2013, I did not instruct, encourage or direct agents of [BSG] to assault Michael Mobley. I did observe that agents of [BSG] made physical contact with Michael Mobley but this was only when he refused to obey instructions that he was not to enter the second story of the company's building. This contact was not made, however, at my request or direction.
>
> 4. I have never reviewed any family or personal records of Yvette Mobley nor have I ever had in my personal possession any personal income tax returns or financial records belonging to the plaintiffs.

Martin's reply also included an affidavit by Richard Kent Morrison Jr., one of the security guards involved in the alleged assault. Morrison stated, in relevant part:

> 3. On April 6, 2013, I was at the offices of [QLRH] when Michael Mobley entered in an aggressive and agitated state after he had previously been instructed by Allan Martin not to come to the company offices. He was instructed by BSG personnel to remain calm and to wait for law enforcement, which had been called and was on its way.
>
> 4. Michael Mobley ignored these instructions and attempted to force his way to the second floor of the building. I was compelled to grab him in order to protect BSG Officer Kain Kennedy, who Mobley charged towards in a threatening and aggressive manner. BSG personnel did not place Michael Mobley in a chokehold but rather restrained him with a variation of a full-nelson, which places no pressure on the throat of the subject but merely traps an aggressor's arms and prevents him from harming others.
>
> 5. My actions and those of other BSG security personnel were in no way directed or suggested by Allan Martin but were solely the result of Michael Mobley's aggressive actions toward security personnel. Throughout the entire incident, Allan Martin was standing behind the

> security personnel so that neither we nor Michael Mobley could see him.

Martin further contended in his reply that, even if all of Mobley's allegations are true, there can be no tort liability because: (1) "the employer of an independent contractor that provides security services is not vicariously liable for the contractor's actions unless the employer exercises detailed control over the security personnel"; and (2) "[i]nstructing security to prevent access to company property by a terminated employee does not constitute assault."

We agree with Martin that, even if Mobley's factual allegations are taken as true, they are legally insufficient to support personal jurisdiction. In *Fifth Club, Inc. v. Ramirez*, the Texas Supreme Court considered whether a nightclub owner was vicariously liable for an assault committed against a patron by a security officer hired as an independent contractor by the nightclub. 196 S.W.3d 788, 790 (Tex. 2006). The Court noted the general rule that "an employer may become liable for the independent contractor's tortious acts only if the employer controls the details or methods of the independent contractor's work to such an extent that the contractor cannot perform the work as it chooses." *Id.* at 791 (citing *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001)).[12] In *Fifth Club*, an employee of the nightclub "signaled" to the security officer to remove the patron, but there was no evidence that any representative of the nightclub

---

[12] There is a recognized exception to this general rule for "nondelegable duties." *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 795 (Tex. 2006) (citing *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 292 (Tex. 2004)). A duty is "nondelegable" when it "is imposed by law on the basis of concerns for public safety." *Id.* (citing *MBank El Paso, N.A. v. Sanchez*, 836 S.W.2d 151, 153 (Tex. 1992)). In such cases, "the party bearing the duty cannot escape it by delegating it to an independent contractor." *Sanchez*, 836 S.W.2d at 153. The *Fifth Club* Court found that the duties performed by the security officer in that case were not nondelegable. *Id.* at 795 (noting that "the Legislature has not identified security work as carrying such nondelegable duties or carved out a special exception allowing business owners or employers to be held liable for the conduct of their independent-contractor security personnel"). Likewise, we find that the security work at issue in this case was not nondelegable.

"gave more than general directions" to the security officer, nor any evidence that it "retained the right to control the manner in which [the security officer] performed his job." *Id.* at 792. The Court held, therefore, that the nightclub could not be held vicariously liable for the security officer's conduct. *Id.* We find the facts alleged by Mobley in his assault claim to be analogous to those at issue in *Fifth Club*. Mobley and his son stated that Martin "motioned" or "nodded" to Morrison prior to the assault, but there is no evidence that Martin controlled the "details or methods" of Morrison's work, nor is there any evidence indicating that Morrison was unable to perform the work as he chose. *See id.* at 791. Mobley therefore failed to meet his burden to produce evidence establishing personal jurisdiction as to the assault claim. *See Kelly*, 301 S.W.3d at 659.

As to Mobley's invasion of privacy and conversion claims against Martin, we find that Martin has conclusively negated all potential bases for jurisdiction. *See Retamco Operating, Inc.*, 278 S.W.3d at 337. In particular, Martin stated in his affidavit that he "never had in [his] personal possession any personal income tax returns or financial records belonging" to Mobley. Mobley did not produce any affidavit testimony or other affidavit testimony refuting this assertion. Accordingly, Mobley failed to meet his burden to produce evidence establishing personal jurisdiction as to the conversion and invasion of privacy claims. *See id.* We sustain Martin's issue as to these claims.

## IV. CONCLUSION

In appellate cause number 13-14-00064-CV, we affirm the trial court's judgment denying QLRH's motion to compel arbitration. In appellate cause number 13-14-00066-CV, we reverse the trial court's judgment denying Martin's special appearance as to Mobley's assault and battery, invasion of privacy, and conversion claims, and we render

20

judgment granting the special appearance as to those claims.  The remainder of the trial court's judgment denying Martin's special appearance is affirmed.


                                        DORI CONTRERAS GARZA,
                                        Justice


Delivered and filed the
19th day of June, 2014.